**DUQUESNE LIGHT COMPANY et al.,**
Petitioners,

v.

**ENVIRONMENTAL PROTECTION
AGENCY.**

, **ST. JOE MINERALS CORPORA-
TION, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION
AGENCY.**

Nos. 72–1542, 72–1543.

United States Court of Appeals,
Third Circuit.

Argued April 2, 1973.

Decided June 5, 1973.

David McNeil Olds, John McN. Cramer, Reed Smith Shaw & McClay, Pittsburgh, Pa., for petitioners.

Edmund B. Clark, Kent Frizzell, John E. Varnum, Bradford F. Whitman, U. S. Dept. of Justice, Land and Natural Resources Div., Pollution Control Section, Washington, D. C., for respondent.

Before ADAMS, ROSENN and HUNTER, Circuit Judges.

## OPINION SUR RESPONDENT'S MOTION FOR CLARIFICATION

ADAMS, Circuit Judge.

Resolution of the motion presently before the Court [1] requires that we address difficult procedural problems arising from the recently enacted programs for the abatement of air pollution.

Duquesne Light Company (Duquesne), Pennsylvania Power Co. and Ohio Edison Co. are engaged in Western Pennsylvania in the generation of electric power by burning coal. St. Joe Minerals Corp. (St. Joe) produces electricity and zinc, also using coal as the fuel. Pursuant to the new clean air programs, Pennsylvania enacted a series of regulations, comporting with federal standards and federally enforceable. Duquesne, Pennsylvania Power, Ohio Edison and St. Joe (collectively, the companies), required by the Pennsylvania regulations to limit their emission into the air of polluting sulphur oxides, challenged the Federal Environmental Protection Agency's (EPA) adoption and potential enforcement of these restrictions in the absence of hearings, *inter alia,* and petitioned this Court to remand the matter to the EPA for such a proceeding.

Although the remand motions requested several alternative forms of relief,

---

1. The motion filed by the Environmental Protection Agency is a "motion for clarification." It seeks clarification or reconsideration of a motion for remand to the EPA granted by this Court.

the order of this Court, granting the motions, did not specify which among the several types of relief was to be afforded. The EPA, opposing the remand directive, filed the motion that we now consider. This motion styled a "Motion for Clarification, or in the Alternative Petition for Rehearing," is responsive to the Court's original order, which in all candor was somewhat enigmatic. This opinion will endeavor to dispel the uncertainty.

Unsnarling the rather intricate procedural knot presented by the motion currently before us requires a careful tracing of the several strands comprising it. This task, in turn, entails an examination of: (1) the Clean Air Act Amendments of 1970 (Act or Clean Air Act) 42 U.S.C. §§ 1857–1858a, (2) the division of authority between states and the EPA contemplated by the Act, (3) the bearing of the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., on the Clean Air Act, (4) the implications of this Court's decision in Getty Oil Co. v. Ruckelshaus, 467 F.2d 349 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S. Ct. 937, 35 L.Ed.2d 256 (1973), and (5) the requirements of due process as mandated by the Fifth Amendment.

## I. THE LEGISLATIVE SCHEMA

■ In enacting the Clean Air Act Amendments of 1970, Congress attempted to foster a symbiosis between two perceived needs. First, Congress wanted to preserve the basic state and local control of the design and enforcement of air pollution regulations. Besides a deference to the states, such a state role permitted more awareness of individual and local problems to be considered in formulating pollution abatement plans.

Second, Congress sensed that there was a rising dissatisfaction with the results being attained by the states, operating under the then existing legislation. Therefore, there was a desire for federal standards and enforcement. Further, Congress, apprised of the public concern, manifested its insistence on expedition in cleaning the air.[2]

The result of these two conflicting strains was that Congress in the 1970 Amendments, devised a system in which certain aspects of the pollution control effort were assigned exclusively to the EPA, other aspects being entrusted to the states under federal supervision.

An understanding of the EPA's role in the bi-level program established by the Clean Air Act requires a brief exposition of the sections of the Act pertinent to the dispute here. Section 108 of the Act[3] mandated that within thirty days after December 31, 1970, the Administrator of the EPA was to determine which emissions into the air were pollutants, adversely affecting public health or welfare. Section 109[4] dictated that roughly contemporaneously, he was to promulgate regulations establishing national primary and secondary ambient air quality standards.[5] These standards defined the maximum concentration to be permitted in the air of any pollutant ascertained under section 108. Written comments by interested parties were to be submitted prior to the final promulgation of these standards, and following Kennecott Copper Corp. v. Environmental Protection Agency, 149 U.S.App.D.C. 231, 462 F.2d 846 (1972), the Agency was to provide statements in support of its proposed regulations.[6] Thus, pursu-

---

2. *See*, Note, Clean Air Act Amendments of 1970: A Congressional Cosmetic, 61 Geo. L.J. 153, 154–9 (1972).

3. 42 U.S.C. § 1857c–3.

4. 42 U.S.C. § 1857c–4.

5. The primary standards were to be designed to insure that the amount of any pollutant allowed would be consistent with protecting the public health. The secondary standards were to be addressed to safeguarding the public welfare.

6. The D.C. Circuit held that without these statements, that court could not properly conduct a judicial review of the Agency actions. 462 F.2d at 850.

ant to sections 108 and 109, the Administrator was to determine the minimum acceptable level in the air of any particular pollutant. Section 110 [7] defined the procedures to be followed to achieve and then maintain these or higher standards of cleanliness. Because the attainment required that choices be made between different sources of pollutants, with some sources perhaps more severely restricted than others, the Act left to the states the drafting of plans for reaching these federally established standards. More specifically, § 110(a)(1) [8] required that, within nine months of the Administrator's promulgation of the ambient air standards, each state was to adopt and submit to the Administrator a plan that would bring the air quality within the state at a minimum, to the federally mandated levels. The "state implementation plan" was to be enacted only after reasonable notice and hearings were held by the state.

Section 110 then continues:

"The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing." [9]

The question of which procedures are required of the Administrator, if any, in determining whether to approve a state implementation plan as provided in § 110(a)(2), forms the core of this case.

After approval of a state implementation plan, the regulations contained therein, presumably already enforceable by the state,[10] become enforceable by the federal government as well. Section 113 of the Act [11] provides that, after permitting a period of thirty days to pass, perhaps to allow the state to initiate an action, the Administrator, having found a violation of the implementation plan, may impose civil and criminal sanctions upon the violator.[12] This enforcement aspect of the statute is a final step in delineating the cooperating and supplementing roles that are prescribed for the states and the EPA.

■ Review by federal courts of actions taken by the Administrator is circumscribed by section 307(b)(1).[13] It provides that petitions for review of the Administrator's actions approving implementation plans are to be filed in the United States Court of Appeals for the appropriate Circuit,[14] within thirty days of the date of the Administrator's approval. Subsection (2) of 307(b) [15] forecloses later litigation in enforcement proceedings of issues for which review could have been had under section 307(b)(1).

## II. THE PENNSYLVANIA PLAN'S ADOPTION

The Administrator, in August, 1971, published guidelines for the preparation, adoption and submission of state plans,[16]

7. 42 U.S.C. § 1857c–5.

8. 42 U.S.C. § 1857c–5(a)(1).

9. Section 110(a)(2), 42 U.S.C. § 1857c–5(a)(2). Subsections (A) through (H) of section 110(a)(2) enumerate certain elements which a state implementation plan must include to be approved by the Administrator.

10. See 35 P.S. §§ 4004(3) & (4.1).

11. 42 U.S.C. § 1857c–8.

12. Section 113(c)(1), 42 U.S.C. § 1857c–8(c)(1) authorizes fines not more than $25,000. a day and/or imprisonment of not more than one year for first viola-

tions of an applicable implementation plan.

13. 42 U.S.C. § 1857h–5(b)(1).

14. There is no dispute that this Court is the appropriate Circuit to consider this question. However, in cases involving metropolitan areas encompassing two or more states, there may be several appropriate circuits. See Natural Resources Defense Council, Inc. v. Environmental Protection Agency, 475 F.2d 968 at 969 (D.C.Cir. filed February 10, 1973).

15. 42 U.S.C. § 1857h–5(b)(2).

16. 36 Fed.Reg. 15486 et seq.

and required that state implementation plans be submitted by January 31, 1972. Following the statute's instructions, the Commonwealth of Pennsylvania gave notice that hearings were to be held regarding its proposed plans. Four hearings, focusing on controlling sulphur oxide emission, a pollutant designated under section 108 and quantitatively described under section 109, were held in Philadelphia, Harrisburg and Pittsburgh, from December 1–4, 1971.[17] At the Pittsburgh session of the hearings, Duquesne, through Mr. L. R. Love, General Superintendent of the Power Stations Department, Pennsylvania Power by Mr. C. B. Shell, Vice-President, and St. Joe, through Mr. Charles P. Henderson, Manager of the Zinc Smelting Division, appeared. Each presented evidence to the members of the Environmental Quality Board, in the form of oral testimony and written statements.

After the hearings terminated, a plan including sulphur oxide restrictions was adopted and submitted by Pennsylvania, on January 27, 1972. The Administrator, in late May, 1972, without further proceedings, approved the plan in part and disapproved it in part.[18] Within the thirty days required by Section 307(b)(1), Duquesne and St. Joe filed petitions in this Court challenging the Administrator's actions regarding the approved portions of the Pennsylvania plan. The companies, arguing that the approved plan included unreasonable requirements, sought to have the matter remanded to the EPA. They asked that the reconsideration of the Pennsylvania Implementation Plan be conducted as either an adjudicative-type hearing, pursuant to Section 5 of the Administrative Procedure Act, (APA),[19] or a rule-making hearing, following Section 4 of the APA.[20] The companies further sought to have this Court require that the EPA, prior to approving the plan, file a detailed environmental impact statement as described in Sections 102(2)(C) and (D) of the National Environmental Policy Act.[21] On January 22, 1973, this Court granted a motion for remand without specifying the type of procedure to be followed by the EPA. The EPA's motion, asking this Court to clarify the order or to rehear the matter, requires an examination of the various types of relief sought by Duquesne and St. Joe.

## III. ADJUDICATIVE HEARINGS

Duquesne and St. Joe contend that due process demands that they be afforded some form of hearing by the EPA prior to the federal adoption of the state implementation plan. Central to a viable concept of due process is the principle that "[c]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."[22]

Moving from this fundament, the Court must proceed to consider the companies' requests for adjudicative or legislative hearings, bearing in mind that the "government function involved" is the protection of the health of the citizenry, and that a degree of flexibility in responding to the companies' requests is essential.

An attempt to draw a bright line between situations requiring adjudicative hearings and those calling for rule-making is a task often unresponsive to the actual problems presented in a given case. Rather, a growing body of case

17. A second series of hearings, dealing with monitoring and reporting techniques, was held in January, 1972.

18. 37 Fed.Reg. 10842, 10889–91.

19. 5 U.S.C. § 554.

20. 5 U.S.C. § 553.

21. 42 U.S.C. §§ 4332(C) and (D).

22. Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

law [23] and scholarly discussion [24] has indicated that hybrid proceedings, tailored to the types of issues contested, appear to be a salutary alternative to efforts to sketch a rigid demarcation. Determination of this case, required, however, that the Court examine both adjudicative and legislative type hearings in fashioning an appropriate order.

Although we do not at this time have to decide whether the EPA is bound to follow the APA, reference to the APA facilitates distinguishing adjudicative hearings from legislative, rule-making proceedings. This Court recently made such a comparison in Virgin Islands Hotel Ass'n v. Virgin Islands Water & Power Authority, 476 F.2d 1263 at 1267 No. 72–1996 (3d Cir., filed April 12, 1973).[25] The Court explicated the difference as follows:

"* * * Rule-making proceedings are controlled by § 553, [of the APA, 5 U.S.C. § 551 et seq.] which requires only that interested parties be given adequate notice of the proposed rule, see § 553(b), and 'an opportunity to participate in the rule making through submission of written data, views or arguments with or without opportunity for oral presentation,' § 553(c). The procedure for adjudication is set out in §§ 554 and 556, under which '[a] party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts.' § 556(d)."

■ The Supreme Court has recently enumerated the occasions in which an adjudicative hearing is required before agency promulgation of a rule. In United States v. Allegheny-Ludlum, 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), and United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), the Supreme Court made clear that unless the statute providing for agency action prescribes "hearings on the record," either in those exact words or in similar phrases, an adjudicative hearing need not be held.[26] Section 110(a)(2) of the Clean Air Act does not speak in terms of hearings prior to EPA approval of the state implementation plans.[27] Therefore, if the APA were applicable there is nonetheless an absence of the language which the Supreme Court has indicated is necessary to trigger the requirement of an adversary hearing.

■ In International Harvester Co. v. Ruckelshaus, 478 F.2d 615 No. 72–1517 (D.C. Cir. filed February 10, 1973), the District of Columbia Circuit remanded

---

23. See International Harvester v. Environmental Protection Agency, 478 F.2d 615 No. 72–1517 (D.C. Cir. filed February 10, 1973); Kennecott Copper Corp. v. Environmental Protection Agency, 149 U.S. App.D.C. 231, 462 F.2d 846 (1972). Accord Drown v. Portsmouth School Dist., 435 F.2d 1182 (1st Cir. 1970), cert. denied, 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed. 2d (1972).

24. See 1 K.C. Davis, Administrative Law Treatise, § 5.01 (1958); Clagett, Informal Action-Adjudication-Rule-Making: Some Recent Developments in Federal Administrative Law, 1971 Duke L.J. 51; Robinson, The Making of Administrative Policy: Another Look at Rule Making and Adjudication and Administrative Procedure Reform, 118 U.Pa.L.Rev. 485 (1970).

25. Virgin Islands Hotel Ass'n did not directly involve proceedings controlled by the APA. Rather, in shaping the type of hearing required of the Virgin Islands Water & Power Authority in rate-making, the Court looked to the APA as a guide.

26. Both Allegheny-Ludlum and Florida East Coast Railway dealt with actions taken by the Interstate Commerce Commission. The Court held that the APA does apply to ICC actions but that rule-making procedures were proper, absent the thaumaturgic language.

27. Other sections of the Clean Air Act do contain requirements that the Administrator act only after hearing. See Section 110(f)(2)(A), 42 U.S.C. §§ 1857c–5(f)(2)(A) and Sections 206(b)(2)(A) & (B), 42 U.S.C. §§ 1857f–5(b)(2)(A) & (B).

proceedings to the EPA. The question to be decided on remand concerned certain aspects of the automobile emission control program, a subject entrusted by the Clean Air Act directly to the Administrator, without involvement or hearings at the state level.[28] Moreover, the section itself contemplates that the EPA would hold hearings on issues raised in this section.[29] Given these two factors, present in *International Harvester,* but wanting in this case, the modified adjudicatory hearing required by the District of Columbia Court[30] is not apposite nor will it be required here.

Duquesne and St. Joe further contend that a failure to accord them an adjudicative hearing in the face of the federal sanctions possible under the Clean Air Act would deprive them of due process. *Florida East Coast Railway, supra,* and *Virgin Islands Hotel Ass'n, supra,* appear dispositive of the due process claims. In both cases, increased rates were being imposed on a general segment of the population. In *Florida East Coast Railway* the increase was an added per diem charge for box cars assessed against railroads, in *Virgin Islands Hotel Ass'n* the increase was a raising of electric rates. The protestants claimed in each case that the higher rates fell more harshly upon them or were more injurious to them than to others. Nonetheless, each Court emphasized the general nature of the rule, not its effect on any particular party, in determining whether an adjudicatory hearing was required by due process. In

each case, the Court concluded that because of the general applicability of the statute, and its prospective effects, adjudicative hearings were not required.[31] Bound by both the Supreme Court and the recent decision of this Court, we hold that on remand, there is no need for adjudicative hearings.[32]

## IV. LEGISLATIVE HEARINGS

### A. *The Getty Oil Dilemma*

At oral argument, the EPA asserted that redress through the state administrative process was the proper course for Duquesne and St. Joe to pursue. The companies applied for variances permitting deviation from the plan's requirements. Petitions seeking variances have, according to counsel, been filed with the appropriate state authority and are wending their way through the state administrative process. Presumably, the final state administrative determination will be subject to judicial review, pursuant to the Pennsylvania Administrative Agency Law, 71 P.S. § 1710.41. Such recourse to the state procedure for correction of alleged imperfections in the Pennsylvania Implementation Plan is the path advocated by the EPA, but an undoubtedly time-consuming course of action. However, it does appear to serve the bi-level design of section 110 of the Clean Air Act.

Getty Oil Co. v. Ruckelshaus[33] illustrates one of the problems created by the bi-level arrangement of the Clean Air Act.[34] Delaware, in accordance with

28. Section 202, 52 U.S.C. § 1857f–1(b)(5)(B).

29. Section 202(b)(5)(D), 42 U.S.C. § 1857f–1(b)(5)(D).

30. International Harvester Co. v. Ruckelshaus, supra, at 649. No. 72–1517 (D.C. Cir. filed February 10, 1973).

31. Each decision evoked critical comment from other members of each Court.

32. In *Florida East Coast Railway* and *Virgin Islands Hotel Ass'n,* as here, there were allegations that the administrative action was a taking of property. In each case the Court nevertheless did not mandate adjudicative hearings. Moreover, in each case there existed the possibility of harsher sanctions for failure to comply with the new regulation, yet trial-type hearings were not mandated.

33. 467 F.2d 349 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L. Ed.2d 256.

34. *Getty Oil* specifically dealt with the availability or means of challenging the Administrator's actions alternative to section 307(b)(1) proceedings. Since this is an action brought pursuant to section 307(b)(1), that problem is not in this case.

section 110, had promulgated an implementation plan. One item in the plan provided that the fuel to be furnished by Getty to an associated power station was to be of a low sulphur content. In August, 1971, the Administrator approved and adopted the portion of the Delaware Plan in question. Getty did not file any petition in the appropriate Circuit Court within the thirty days prescribed by section 307. Getty did, however, launch state administrative and judicial challenges against the plan, questioning the action of the state agency whose responsibility the promulgation of the plan had been. The variance Getty sought from the administrative agency was denied. Getty then instituted an action in the Delaware state court. That court granted Getty's request for injunctive relief and stayed enforcement by the state of the objectionable provisions of the Delaware Plan. The Federal EPA, however, not bound by the state court injunction, commenced enforcement proceedings, and Getty then sought injunctive relief in the federal court. Both the district court and this Court denied Getty's claim for relief.[35] Thus Getty found itself in a difficult position. It was liable to federal sanctions, imposed because Getty was violating a state regulation adopted by the Federal Government, but in effect, repudiated by the state. The present case presents the Court with the specter of a recurrence of the *Getty* paradox. Here the plan has been adopted by, and is enforceable by, the EPA during the time state proceedings that might alter the plan are underway. A proper decision of this case requires a resolution of this predicament. However, such resolution will be considered in the concluding section of this opinion.

### B. *The Requirements of the APA*

Duquesne and St. Joe argue that the action of the Administrator is rule-making as defined by section one of the APA [36] and, as such, requires at least a legislative-type hearing pursuant to section 4.[37] Recently, the Court of Appeals for the Fourth Circuit was called upon to review a similar contention.[38] That court, considering the existence of state hearings, the alacrity stipulated by Congress, the purposeful omission of language requiring a hearing at the federal level after the state adopts its plan, and the presumably duplicative testimony that would be elicited by a federal hearing, concluded that Congress had in effect found that:

"* * * a hearing at the Administrator's level was both 'impractical' and 'unnecessary.' That finding met the requirements of section 553(b)(B), 5 U.S.C., exempting certain rule-making proceedings from any requirement of a hearing, if, as the petitioners argue, that Act is applicable to the Administrator's action." [39]

We find this reasoning persuasive.

Although we have held that the Administrator is not bound to comply with the requirements of the APA, that does not conclude the consideration of the necessity for some sort of hearing at the federal level. This Court stated, in *Getty Oil,* that the "Constitution requires an opportunity at a meaningful time and in a meaningful manner for a hearing appropriate to the nature of the case." [40]

35. This Court and the district court differed on the basis for denying relief. The district court held that pre-enforcement relief might be available in a proceeding other than under section 307(b)(1), but found that the equitable requirements necessary for granting relief were not present. Getty Oil Co. v. Ruckelshaus, 342 F.Supp. 1006, 1023–1025 (D.Del. 1972). This Court, as stated earlier, *see* Note 34 *supra*, held that section 307 was controlling.

36. 5 U.S.C. § 551.

37. 5 U.S.C. § 553.

38. Appalachian Power Co. v. Environmental Protection Agency, 477 F.2d 495 No. 72–1733 (4th Cir., filed April 11, 1973).

39. *Id.* at 502–503.

40. 467 F.2d at 356.

A review of the proceedings conducted by the Pennsylvania Environmental Quality Board does not convince us that a truly meaningful hearing was afforded Duquesne and St. Joe. Moreover, the Pennsylvania proceedings occurred over sixteen months ago, before the general concern about the energy crisis and before certain problems with sulphur oxide control equipment had been fully documented. Therefore, it appears that an order remanding the matter to the EPA, with instructions to conduct a limited legislative-type hearing, might be appropriate.[41] Again we defer further discussion of such matter until the latter portion of this opinion.

## V. REQUEST FOR ENVIRONMENTAL IMPACT STATEMENT

■ Duquesne and St. Joe have requested that this Court order the EPA to prepare an environmental impact statement in connection with their administrative action, conforming with sections 102(C) and (D) of the National Environmental Policy Act (NEPA).[42] Several courts have examined the question of NEPA's applicability to the EPA.[43] All have concluded that to require an agency charged with protecting the environment with the obligation to file a statement explaining the environmental impact of its decisions would be redundant.

The Court of Appeals for the District of Columbia stated in *International Harvester:*

"Although we do not reach the question whether EPA is automatically and completely exempt from NEPA we see little need in requiring a NEPA statement from an agency whose raison d'être is the protection of the environment: . . . "[44]

The EPA, on the remand in *International Harvester,* was required, *inter alia,* to produce a decision setting forth its reasoning for granting or denying relief, the same material from which a NEPA statement would be composed. As the Court of Appeals for the District of Columbia noted, the requirement of an impact statement in the circumstances would be a "hollow formalism."

In *Getty Oil* it is clear that this Court was deciding that if a NEPA statement were required, Getty had not commenced the appropriate proceeding to force one: "Even if we were to agree . . . that EPA is subject to the NEPA requirement, such an issue is properly raised in a section 307 proceeding."[45] Basically, the same conclusion was reached by the district court in *Getty Oil.*[46]

*Appalachian Power,* however, relying on the opinion in *Getty Oil,* squarely held that NEPA was not applicable to the action of the Administrator in approving a state implementation plan.[47]

Presented with the square holding of the Fourth Circuit, and the logically appealing pronouncements of this Court, the District of Columbia Circuit Court, and the District Court in Delaware, we hold that, in approving the state implementation plans, the Administrator is not required to meet the impact statement requirements of the NEPA—certainly in the context of this case.

## VI. CONCLUSION

■ In attempting to unravel the problems concerning the procedures on remand, if remand there be, this Court

---

41. For a discussion of the requirements of this hearing, see the concluding section of this opinion, *infra.*

42. 42 U.S.C. §§ 4332(C) and (D).

43. *See* International Harvester v. Environmental Protection Agency, *supra,* 478 F.2d at 650, n. 130; Appalachian Power Co. v. Environmental Protection Agency, *supra* 477 F.2d at 508; Getty Oil Co. v. Ruckelshaus, 467 F.2d 349, 359 (3 Cir. 1972); Getty Oil Co. v. Ruckelshaus, 342 F.Supp. 1006, 1020–1022 (D.Del.1972).

44. International Harvester, *supra,* 478 F.2d at 650, n. 130.

45. 467 F.2d at 359.

46. 342 F.Supp. at 1021.

47. 477 F.2d at 508.

has addressed several issues. We have examined the requests for adjudicative hearings and for an order requiring a NEPA impact statement. These requests the Court refuses to grant. We have also scrutinized the problem created by the *Getty Oil* case and the request for a legislative hearing. These issues do affect the rights of Duquesne and St. Joe and require resolution. In resolving them, however, the Court is mindful of the desire for rapid action expressed by Congress in enacting the Clean Air Act, and the role the Act plays in protecting the nation's health by requiring clean air. Moreover, we are cognizant of the circumscribed opportunity for review provided by Congress, again manifesting an insistence on expedition. In view of the limited review proceeding, this Court holds that, except as it applies to Duquesne, Pennsylvania Power, Ohio Edison and St. Joe Mineral, whose petitions for review were timely filed under section 307(b)(1), the Pennsylvania implementation plan remains in effect.

■ The basic problem presented by the *Getty Oil* dilemma and the legislative hearing request is that the petitioning companies are liable to sanctions before they have had an opportunity either to complete their state administrative and judicial remedies or to be heard at the federal level. The Court finds that to expose the companies to the risk of punishment without affording them full occasion to express their objections to the state implementation plan is fundamentally unfair. Therefore, this Court instructs the EPA that it must *either* (a) refrain from imposing any penalties on *these companies* during the pendency of their state administrative and judicial actions, so long as such actions are pursued by the companies in good faith and with due diligence, *or* (b) afford the companies a limited legislative hearing.

Accordingly, within thirty days of the date of this Court's order, the EPA shall elect, in writing, the course it plans to pursue. If the election is to afford the companies a limited legislative hearing, such a hearing would consist of: (1) permitting the companies to file written comments pertaining to the economic or technological infeasibility of the Pennsylvania Implementation Plan, within 20 days of the EPA's election; (2) within 20 days of the filing of the comments, Pennsylvania shall submit comments in support of its plan; (3) upon receipt of the comments of the state, the EPA shall, if either the state or the companies request, hear further oral statements by both sides, which hearing need not include cross-examination; (4) no later than 30 days after the date of the receipt of the last comments, or after the conclusion of the oral hearing, whichever is later, the Administrator shall file with this Court the record compiled on remand, his decision approving or disapproving the Pennsylvania implementation plan as it applies to the companies, and a statement of his reasons for taking such action, considering both the material submitted and oral presentations by the state and the companies.[48]

Requiring the EPA, the agency that has considerable expertise, to choose one of these two courses of action may appear to some to be a deviation from the type of relief traditionally granted by courts.[49] However, only through change

---

48. *See* Natural Resources Defense Council v. Environmental Protection Agency, 475 F.2d 968 (D.C. Cir., filed January 31, 1973) and Kennecott Copper Corp. v. Environmental Protection Agency, 149 U.S.App.D.C. 231, 462 F.2d 846 (1972).

49. It may be contended by some that this remedy is not perfect. For example, if certain options are selected and certain conclusions reached, the effect of this decision may merely postpone placing the companies in the *Getty* dilemma. Moreover, certain questions presented but not decided at this time may reappear at a later date. However, as frequently happens in the implementation of new statutes, and especially enactments which present a unique approach to a difficult legislative problem, the courts must search out procedural solutions. Nonetheless, this Court is of the considered opin-

can continuity with the spirit of experimentation that characterizes our system of government be maintained. Moreover, the propriety of this relief is, in our judgment, further confirmed by a recognition of the distance from the usual that is represented by the problem before the Court. A proper balancing of the rights of the petitioning companies and the critical public interest in a healthy environment requires no less.

An order will be entered, remanding the matter to the Environmental Protection Agency for proceedings in conformity with this opinion.

ion that the remedy prescribed by this decision is the most responsive to the conflicting claims, first, that the entire matter be expedited, and second, that valuable rights not be diminished. We recognize that in this situation we are operating on the frontiers of legal thought, and any advance post that we take up is liable to the dangers of heavy ground assault. But it is only by such expeditions that knowledge of the terrain ahead may be gained.