337 A.2d 823

**COMMONWEALTH of Pennsylvania DEPARTMENT OF ENVIRONMENTAL RESOURCES, Appellant,**

**v.**

**PENNSYLVANIA POWER COMPANY.**

Supreme Court of Pennsylvania.

Argued Dec. 3, 1974.

Decided April 25, 1975.

676

678

680

———◆———

Marvin A. Fein, Barbara H. Brandon, Sp. Asst. Attys. Gen., Harrisburg, for appellant.

William R. Balph, Jr., Chambers, O'Neill, Nicolls & Balph, New Castle, for appellee.

Wallace H. Johnson, Asst. Atty. Gen., Raymond N. Zagone, Atty., Dept. of Justice, Alan G. Kirk, II, Asst. Administrator for Enforcement and Gen. Counsel, E. P. A., Washington, D. C., Joseph M. Manko, Regional Counsel, Region III, Marc E. Gold, Atty., Enforcement Div., Region III, E. P. A., Philadelphia, for amicus curiae E. P. A.

Harold R. Schmidt, Lawrence A. Demase, Edwin J. Strassburger, Rose, Schmidt & Dixon, Pittsburgh, for amici curiae, West Penn Power Co., Monongahela Power Co. and Potomac Edison Co.

Harry H. Voigt, LeBoeuf, Lamb, Leiby & MacRae, Washington, D. C., for amici curiae Edison Electric Institute and Chamber of Commerce of the United States.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION

JONES, Chief Justice.

This is an appeal from the Commonwealth Court's affirmance of an order of the Court of Common Pleas of Lawrence County dated April 19, 1973, dismissing the appellant's, Department of Environmental Resources

(DER) [1], petition and rule to show cause why the appellee, Pennsylvania Power Company (PPC) and Ray E. Semmler, president of PPC, should not be adjudged in contempt of court. The present litigation arises from the appellee's failure to comply, and its subsequent defense of impossibility to comply, with a prior unappealed court order requiring the appellee to submit a pollution control plan in compliance with newly promulgated particulate matter and sulfur dioxide emission standards.

The primary issue before this Court, namely, whether the trial court abused its discretion or committed error of law in dismissing the DER petition for contempt was previously addressed in a well-reasoned Commonwealth Court opinion (12 Pa.Cmwlth. 212, 316 A.2d 96 (1974)). Nevertheless, since this issue has triggered important corollary, first impression questions concerning the DER's ability to enforce prospective "technology-forcing" environmental standards and the appropriate means for asserting the defense of impossibility to a court order incorporating such standards, we granted allocatur and for reasons hereinafter set forth affirm.

## Background

The operation of five coal-fired steam boilers at the electric generating facility of the PPC, located in Taylor Township, Lawrence County, Pennsylvania, provides the subject of this appeal. As early as April 22, 1970, the Pennsylvania Department of Health, predecessor in interest to the DER, issued an order that PPC install air pollution control equipment and/or institute process changes designed to limit particulate emissions to the levels specified in the then existing particulate matter

1. The DER of Pennsylvania is an administrative agency authorized by the Pennsylvania Air Pollution Control Act, as amended 1968, June 12, P.L. 163, No. 92; 1970, July 23, P.L. 606, No. 201; 1972 Oct. 26, P.L. 989, No. 245; 35 P.S. § 4001 et seq., to prepare, develop, and enforce rules and regulations for the control and abatement of air pollution in the Commonwealth of Pennsylvania.

regulations.[2] However, the adoption of more stringent regulations for particulate removal and the establishment of sulfur dioxide emission control appeared imminent. Since the adoption of such regulations would likely necessitate the replacement of any newly installed equipment, the appellee believed delay in installation was warranted. Accordingly, on May 15, 1970, PPC appealed the Department of Health's order to the Pennsylvania Air Pollution Commission. On January 11, 1971, following an adjudicatory hearing, the Commission affirmed the Department's order but extended the date for submission of an abatement plan and schedule until June 1, 1971, and extended the date for compliance until October 31, 1972. PPC never appealed from or complied with the Commission's order.

Failing to obtain compliance through negotiations or by extending the June submission date, the Commonwealth [3] filed a complaint in equity and a motion for preliminary injunction to compel compliance with the Commission's January order. Subsequently, on February 22, 1972, a hearing was held on the motion in the Common Pleas Court of Lawrence County.

In the meantime, on January 27, 1972, as had been anticipated by PPC, the Environmental Quality Board of the DER promulgated upgraded regulations for the control of particulate matter and new regulations for the control of sulfur dioxide emissions.[4] On January 31,

2. The limits, specified in § 1.4 of Regulation V of the Air Pollution Commission, were adopted on January 29, 1969, and required approximately 99% particulate collection in contrast to the 98% collection efficiency formerly required under Regulation IV.

3. This action was taken pursuant to sub-section 4010(a) of the Air Pollution Control Act of January 8, 1960, P.L. 1459, 2119, as amended 35 P.S. § 4010(a).

4. Section 22 of Chapter 123 of Title 25 of the Rules and Regulations of the DER was promulgated pursuant to the Air Pollution Control Act, 35 P.S. § 4005 and Section 20 of the Administrative Code Act of December 3, 1970, P.L. 834, No. 275, 71 P.S. § 510–20. Contained therein was the sulfur dioxide emission standard for power plants of the size of the PPC installation.

1972, these regulations were submitted as part of the Pennsylvania Implementation Plan to the Federal Environmental Protection Agency (EPA) and on May 31, 1972, these regulations received federal approval, pursuant to the Federal Clean Air Act Amendments of 1970 (42 U.S.C.A. § 1857 et seq.)[5]

Thereafter, taking judicial notice of the new DER regulations and *going beyond the issues raised in the DER's complaint,* the Court of Common Pleas, on September 1, 1972, issued an amended order[6] against PPC requiring compliance with the new regulations by July 1, 1975, and ordering PPC to file an application for plan approval with the DER by October 7, 1972.[7]

PPC did not appeal the order but submitted a timely application which (a) committed the company to the installation of electrostatic precipitators to meet the upgraded particulate standards, (b) detailed the reasons

5. See 40 C.F.R. Part 52, Subpart NN, Section 52.2020 et seq. (1972). The Clean Air Act is a lengthy and complex piece of legislation intended to *coordinate* federal and state action in the control of air pollution. Pursuant to the provisions thereof, the Administrator of the Environmental Protection Agency was required to determine which emissions were pollutants which adversely affected public health or welfare and to immediately promulgate regulations establishing national primary and secondary air quality standards defining the maximum concentration of pollutants allowed. (Sulfur dioxide was so designated in the regulations adopted under the Clean Air Act, 40 C.F.R. 50.4; 36 C.F.R. 22.384, on November 25, 1971). Within nine months each state was to adopt and submit to the Administrator a plan that was compatible with the federally mandated levels. If approved by the Administrator, the regulations contained in these plans became enforceable by both state and federal authorities. For a further description, *see Natural Resources Defense Council, Inc. v. Environmental Pro. Agency,* 489 F.2d 391 (5th Cir. 1974).

6. This order was substantially the same as a prior court order issued on August 7, 1972.

7. The September order also stated that a supplemental decree would be entered dealing with the appellee's responsibility to comply with the Air Pollution Commission order of January 11, 1971, until such time that compliance with the new DER regulations was attained. Accordingly a supplemental order was issued on December 21, 1971. Since compliance with this later order is not being contested, it is not considered in this appeal.

that it could not meet the sulfur dioxide emission requirements and (c) proposed the construction of higher stacks to improve ambient air quality.[8]

██ Thereafter, the DER neither rejected nor accepted the application, nor did it request additional information or a conference concerning the application's validity. Based on its belief that the application as filed was a contemptuous violation of the September 1 court order, the DER elected to file a petition for contempt. It sought the imposition of sanctions including but not limited to the incarceration of Ray E. Semmler and the imposition of a $25,000 per day fine on the appellee and Semmler until full compliance was attained.[9]

On November 20, 1972, following the filing of the contempt petition, the court issued a rule upon PPC to show cause why appellee and its officers should not be held in contempt. Beginning in January of 1973, a five-day hearing on the petition was held. At that time, a myriad of technical, scientific and engineering data was set forth. The crux of the PPC evidence, adduced from two environmental experts and several company officers, was that no desulfurization system had yet been demonstrated as workable on large coal-fired electric generating

8. Although higher stacks control sulfur dioxide ground level concentrations at acceptable levels by *dispersing* the pollutants in the atmosphere, since the standard to be attained pursuant to the state regulations was an *emission* standard, (*See* 42 U.S.C.A. § 1857c–5(a)(2)), it could only be met by installation of equipment which scrubs the sulfur dioxide from the flue gas or by the use of a low sulfur content fuel *reducing* the quantity of sulfur dioxide emitted in the air.

9. Although the federal civil penalties provision of the Clean Air Act (42 U.S.C.A. § 1857c–8(c)) authorized penalties of this nature, since the Environmental Protection Agency Administrator did not bring the present enforcement action and since the state plan was not then federally enforceable, (*See Duquesne Light Co. v. Environmental Protection Agency*, 481 F.2d 1 (3d Cir. 1973)), federal remedies were not applicable. Further, since the penalties sought exceeded those authorized by the Pennsylvania Air Pollution Control Act (35 P.S. § 4009), even had the court found PPC in contempt, the penalties sought would not likely be enforceable.

boilers, that workability was not yet predictable, and that low sulfur fuel in quantity sufficient for PPC's electric generating operating was unobtainable. In rebuttal, the Commonwealth introduced testimony of a federal expert that indicated adequate equipment was presently in operation in Japan and that similar operations were in the process of being installed in several American plants. On the basis of PPC's evidence and its contestation of the federal expert's evidence, the Court of Common Pleas denied the petition for contempt holding that it was impossible for PPC to comply with the order of September 1, 1972, that there was no willful disregard or disobedience of the court's order and that good faith efforts had been made to abide by the state regulations. On appeal the Commonwealth Court unanimously affirmed the trial court's decision.

*Legal Issues*

■ An appellate court's scope of review in equity matters is limited. Act of April 18, 1919, P.L. 72, 91, as amended 12 P.S. § 1165. Only where it appears that the trial court committed error of law or abuse of discretion will its findings be disturbed. *Commonwealth ex rel. McClintock v. Kelly,* 307 Pa. 525, 161 A. 737 (1932), *Commonwealth v. United States Steel Corp.,* Pa.Cmwlth., 325 A.2d 324 (1974). *See also Bata v. Central-Penn National Bank of Philadelphia,* 433 Pa. 284, 249 A.2d 767 (1969), *Milk Control Commission v. McAllister Farm Dairy,* 384 Pa. 459, 121 A.2d 144 (1956).

The DER contends that in the instant case the trial court committed both abuse of discretion and error of law. First, the DER argues that the trial court abused its discretion by concluding compliance with the court order of September 1, 1972, was impossible and that PPC acted in good faith in filing its application when neither conclusion was supported by the evidence. Secondly, the DER contends the trial court erred by ruling on the va-

lidity of its original order in a civil contempt proceeding. And lastly, the DER claims the trial court erred by substituting its expertise for that of the administrative agency. We have examined these contentions and find them to be without merit.

## I

■ It is hornbook law that contempt is any conduct that "brings into disrespect the authority of a court, . . . willful disregard or disobedience of the court's orders, . . . conduct which tends to impede the due administration of justice" and that such contemptuous conduct must be predicated on "some degree of delinquency or misbehavior. . . . " 7 P.L.E. Contempt § 1 at 517. Accordingly, it follows that the power of the court to punish contempt may be exercised to vindicate the dignity of the court for disrespect shown to it or its orders or to compel the performance of some order or decree of the court which is in the power of the party to perform and which he refuses to obey. 3 Am. & Eng. Ency. of Law 794.

■ With the preceding in mind, it is clear that a showing of noncompliance with a court order in itself is not sufficient to prove contempt. If it is demonstrated that an alleged contemnor is unable to perform (in contrast to willfully disobeying) and has in good faith attempted to comply with a court order (in contrast to having shown disrespect), the purposes for punishing noncompliance are eliminated. *Accord United States v. Bryan,* 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *Maggio v. Zeitz,* 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948); *F. T. C. v. Blaine,* 308 F.Supp. 932 (W.D.Ga. 1970); *Brocker v. Brocker,* 429 Pa. 513, 241 A.2d 336 (1960); *Arlington Seating Company v. New Philadelphia School District,* 317 Pa. 179, 176 A. 221 (1935); *Sanitary Water Board v. Blue Coal Corp.,* 56 D. & C.2d 582, 94 Daugh. 240 (1971).

■ Turning now to the evidence presented at trial we find the record more than adequately substantiates the trial court's finding that PPC made a good faith attempt to comply with the September court order but that full compliance was impossible.

To begin with, the trial record reveals that appellee had made a complete investigation to ascertain the availability of coal, oil or gas with a sulfur content low enough to enable compliance with DER standards and that no such fuel had been discovered. Although the DER alleged that the possibility of obtaining low sulfur oil from a foreign supplier existed, in light of the discouragement received from the EPA Administrator regarding conversion of power plants to alternate fuels and in view of the evidence that such reliance involved certain risk, DER's contention appeared unwarranted.

The trial record also contains a thorough evaluation of every flue gas desulfurization system then in demonstration (*e. g.,* dry injection, wet limestone scrubbing, magnesium oxide scrubbing, catalytic oxidation and sodium sulfate) and ample evaluation of the specific experiences at the various demonstration plants (*e. g.,* Union Electric Company, Kansas Power and Light Company, Con Edison Company, Boston Edison Company, and Illinois Power Company). On review of the information contained in these evaluations, it was possible for the trial judge to conclude that: (1) serious drawbacks existed in *each* demonstration system (*e. g.,* hard chemical deposits, low removal efficiency, soft, solid build-up, severe waste, water pollution problems and continual shutdown time), (2) no available flue gas desulfurization system had been adequately demonstrated to enable compliance with the DER sulfur dioxide emission limitations, and (3) there was no way of accurately predicting which if any of these or other processes would prove acceptable in the foreseeable future.

Despite PPC witnesses' lengthy testimony indicating the preceding facts, the DER has continued to question the good faith of PPC's application. Basically, the DER contends that if PPC were acting in good faith, a commitment to a wet scrubbing system would have been included in the PPC application. To support this contention the DER points to evidence in the trial record indicating that: (1) at the time of the hearing, wet scrubbing systems had been or were about to be installed in several United States plants, (2) a Chemico lime scrubbing plant, located in Mitsui, Japan, and started-up in March of 1972, appeared promising, and (3) Pennsylvania Power had recently committed its new Shippingport installation to the construction of a Chemico scrubbing system.[10]

Nevertheless, the evidence indicated that the newly planned and constructed United States flue gas desulfurization operations, including the one at Shippingport, were so experimental their ability to comply with the new regulations was only theoretical. Further, finding that the experience in Japan could not fairly be extrapolated to the problems faced by PPC was also justifiable in view of the overwhelming evidence demonstrating that many differences existed between the Mitsui and Pennsylvania plant sites.

Rather than propose a plan of totally unproven methods, the PPC chose to commit itself to what then ap-

10. The scrubbers at Shippingport were not guaranteed by its manufacturer to operate within limits set by the DER and were thus to be installed with great reservations at a cost of approximately ninety-two million dollars.

Further, the Shippingport installation was not the first of appellee's attempts to accelerate development in the area of pollution control: PPC's parent company, Ohio Edison, had been conducting its own extensive research in the field in a joint program with Babcock & Wilcox, ESSO Standard and fifteen other utility companies.

peared to be the "best available technology."[11] PPC se-
lected the methods submitted in its application only after
much research had demonstrated that complete and liter-
al compliance with the September order was impossible.
The breadth of research and the reasonableness of the
PPC's conclusions reveals its good faith effort to comply
with the September order. The record fails to support
any finding of misbehavior or delinquency on which to
base a finding of contempt.

■■■■ DER further argues that the lower court's
conclusion that compliance was impossible ignores two
issues, *i. e.*, that conclusion fails to address the question
of whether the new sulfur dioxide standards "would be
attainable in 1975" and avoids the technology-forcing as-
pects envisioned by the Federal Clean Air Act. Never-
theless, we believe that an inquiry into these two "over-
looked" issues was not necessary to the determination of
whether PPC was in contempt of the September order.
The only question properly in issue was whether on the
"commitment date" of October 7, 1972, PPC was able to
predict how compliance with new sulfur dioxide stan-
dards would be attained. Neither the PPC nor the trial
court attacked the reasonableness of 1975 as the year for
performance. In fact, it was both parties' hope that by
1975 the new standards would not only be *attainable* but
*attained*. Nevertheless, PPC questioned the reasonable-
ness of prematurely committing its Taylor Township
power plant to a method that would only "hopefully" be-
come acceptable by 1975. Since neither the Clean Air
Act itself nor an order made pursuant to the provisions
of the Federal Act,[12] required PPC to commit itself to a

11. The purposes section of the Pennsylvania DER Rules and Reg-
ulations itself requires power sources to take action to meet the
standards contained therein "consistent with the best available
technology." Title 25, Rules and Regulations, D.E.R. Art. 3, Ch.
127, Secs. 127.1(5) and 127.12(5).

12. We have not lost sight of the fact that once the State Imple-
mentation Plan was approved by the EPA Administrator such

"complying" plan of action as early as October 7, 1972, we fail to see how this issue involves or necessitates a discussion of federal policy.[13]

## II

The DER has continued to maintain that the trial court should only have determined whether there had been performance of its September order. If impossibility of performance could have been raised at the hearing on injunction, on appeal from the order, or in a petition to modify or dissolve the order, the DER contends that such defense could not be raised for the first time in a hearing for contempt.

■■■■■ This contention is without merit. To begin with, since the *only* hearing prior to the issuance of the September order occurred on February 22, 1972, and related to the Commonwealth's motion for injunctive relief under the earlier particulate removal standards, the de-

plan could normally be put into effect by federal application (42 U.S.C.A. § 1857c–8). Nevertheless, at the time of the instant contempt hearing, the Court of Appeals for the Third Circuit had specifically stayed federal enforcement against PPC and two other utility companies until these companies were given a "full opportunity" to demonstrate the unreasonableness of applying the new emission standards at their particular power plants. *Duquesne Light Co. v. EPA*, 481 F.2d 1 (3d Cir. 1973).

13. However, even if this case involved an order calling for the application of federal policy, we believe the lower court's decision would not be disturbed. The Federal Courts of Appeal have said in no uncertain terms that environmental law may not require the impossible. Only that which is "currently achievable" or that which based on reasoned prediction can be said to likely comply with emission or ambient air standards, may be federally required. *Portland Cement Association v. Ruckelshaus*, 158 U.S. App.D.C. 308, 486 F.2d 375, 389, 391 (1973), *Essex Chemical Corp. v. Ruckelshaus*, 158 U.S.App.D.C. 360, 486 F.2d 427, 433–34 (1973) cert. denied. *Accord Buckeye Power Company, Inc. v. EPA*, 481 F.2d 162 (6th Cir. 1973) and *Duquesne Light Company, supra*. Since it was clearly shown that the predictability of the then available removal methods had not been adequately demonstrated, we doubt even the "technology-forcing" aspects of the Federal Clean Air Act could save the instant court order.

fense of impossibility of performance under the new regulations was not available.[14] Further, since the order as issued called for the incorporation of a DER approved application, to hold that PPC should have foreseen that its application would neither be accepted nor rejected, overlooks PPC's position that the application was valid and should have been (as it was) incorporated into the lower court order. Consequently, even if legally able to petition or appeal, such actions could reasonably have appeared premature to PPC.

Regardless of the appropriateness or PPC's ability to have raised the defense of impossibility at the hearing, on appeal or in a petition to modify,[15] the trial

**14.** It has long been the law that "[e]very precaution should be taken that orders issue, . . . *only when it appears that obedience is within the power of the party being coerced by the order."*

*Maggio v. Zeitz,* 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1966) (emphasis added). Since, in the instant case, *no* precaution was taken, prior to the September order's issuance, to determine whether it was within PPC's power to comply with the *new* sulfur dioxide standards (*i. e.,* there was neither a DER nor court determination on this issue) the propriety of the court's taking judicial notice of the sulfur dioxide standards, *in the first place,* is doubtful. Nevertheless, having failed to take precautions prior to issuing its order, it was incumbent on the court to take the "necessary precaution at the contempt proceeding."

**15.** In the amicus curiae brief filed by West Power Company, Monongahela Power Company and Potomac Edison Company, an additional reason is submitted for PPC's not having raised its "impossibility" earlier. According to amici, PPC was inhibited from *petitioning* to modify the court order as such a petition would necessarily entail a direct attack on the "reasonableness" of the DER sulfur dioxide standards. Once the standards were federally approved, the amici contend § 307(b)(1) of the Clean Air Act, 42 U.S.C.A. § 1857h–5(b)(1) gives exclusive jurisdiction to Federal Courts of Appeal for review of the state emission standards (*Getty Oil Company v. Ruckelshaus,* 467 F.2d 349 (3d Cir. 1972) cert. denied 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256, *Duquesne Light Co. v. EPA,* 481 F.2d 1 (3d Cir. 1973)). Although the amici have not convinced this Court that Section 307 precludes the limited review involved when a "particular hardship" vis-à-vis a "particular application" of the standards, is raised in the petition of a power source, (*i. e.,* when the reasonableness of federal approval *in general* is not challenged, *see Buckeye Power Company v. EPA,* 481 F.2d 162 (6th Cir. 1973), *Duquesne Light*

court's consideration of that defense was a proper one. The trial court's inquiry into PPC's "willful disobedience" necessarily entailed an inquiry into PPC's ability to perform.[16] Since DER's sole purpose in bringing the contempt action was to coerce PPC into "literal compliance," it was *inherent* in the nature of such proceeding to consider the probable effectiveness of DER's suggested sanctions. *Brocker v. Brocker,* 429 Pa. 513, 521, 241 A. 2d 336, 339 (1960). It has long been both federal and state sentiment that courts will not insist upon performance of their orders, when through no fault of the "noncomplying" party, he is unable to perform. *United States v. Bryan, supra; Shillitani v. United States,* 384 U.S. 364, 371, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Arlington Seating Company v. New Philadelphia School District, supra; Sanitary Water Board v. Blue Coal Corporation, supra;* 17 Am.Jur.2d Contempt § 51 and 7 P.L. E. Contempt § 9.

## III

The confusion over that which transpired below lies in the fact that neither the Clean Air Act nor the Air Pollution Control Act anticipate that a court would prepare its own order to abate air pollution without "agency assistance." The Acts provide for an Administrative Process, *i. e.,* the application of state standards to specific sources through *agency* orders and a court's "en-

*Co. v. EPA, supra),* since it appears that PPC was not aware that a petition to modify or dissolve may have conflicted with Section 307, we need not address amici's argument at this time.

16. Although appellant cites cases standing for the proposition that the failure to raise a defense to a court order prior to a contempt proceeding acts as a waiver of such defense, these cases are distinguishable. In each case cited, the alleged contemnor took the position that the court's order had been irregularly obtained, was void or invalid, or was based upon an invalid statute (none of which defenses are advanced in this case). Moreover, in each of the cases cited a finding was made of willful disobedience based on the contemnor's ability to perform.

forcing function" to compel compliance with such *agency orders*. *See* 35 P.S. § 4001 et seq. and 42 U.S.C.A. § 1857 et seq. Under these Acts, if an agency order or decision is challenged, review is limited to administrative review.

■■■ Here, unlike other cases in this area, the "enforcing court," in what appears to be a good faith attempt to ameliorate an already drawn out conflict between PPC and the DER, formulated its own order, including its own commitment date. *"Agency input"* as anticipated by the statutes was never added and consequently *had not been reviewed.*

With the preceding in mind, it is clear that the DER's last contention, *i. e.*, that the lower court substituted its expertise for that of the agency, is without merit. The duties placed on the PPC were placed there by the court (and not by the DER, EPA or Environmental Quality Board). In bringing a petition in contempt it became the court's duty to determine whether a violation of its own order existed. Whether the DER was satisfied with PPC's performance was not at issue.

■■■ It is important to note that the DER was given the opportunity to make a "reviewable" decision but chose instead to file for contempt. Had the DER decided to pass on the acceptability of the PPC application, state administrative remedies would have become available and likewise court review of agency findings. *See North American Coal Corp. v. Air Pollution Commission*, 2 Pa. Cmwlth. 469, 279 A.2d 356 (1971); *Standard Lime and Refractories Company v. Department of Environmental Resources*, 2 Pa.Cmwlth. 434, 279 A.2d 383 (1971). Only in this context (pursuant to Pennsylvania Administrative Agency Law, 71 P.S. § 1710.4) would judicial review have been as limited as DER now suggests.[17] Since

17. Review of an agency decision permits the court to ask only whether "based on the full record before the agency, the agency's

the DER chose the more traditional contempt forum, it cannot evaluate the review provided in terms of agency law.

In light of the fact that the parties had the opportunity to resolve their conflict through administrative procedures, we must remind the litigants we do not condone their otherwise proper reliance on the courts.

 "As happens all too often in current administrative law cases, both the regulators and the regulated expect the judicial branch of government to take them by the hand and lead them through the maze of confusion to a proper determination. Courts are not scientific experts in the field of air pollution and should not be called upon to solve the scientific problems which the regulators and regulated should solve. . . . Courts are intended to decide cases on the record made and the applicable law." *Commonwealth v. United States Steel Corp.,* Pa.Cmwlth., 325 A.2d 324, 328 (1974).

Based on the court's limited role in the present matter, the lower court's decision can only be viewed as an extremely limited act. In dismissing the DER contempt petition, that which was decided was only whether on October 7, 1972, the PPC was able to submit an application stating how by June 1, 1975, compliance with DER standards would be achieved. The October date was court-contrived and did not appear in the DER Rules and Regulations or federal or state statute. Consequently, in deciding this question, whether the DER standards themselves were valid, whether the Environmental Quality Board or EPA had properly exercised its duty in passing or approving such standards, or whether subsequent

action was arbitrary capricious or an abuse of discretion." *See Commonwealth v. Harmar Coal Company,* 452 Pa. 77, 306 A.2d 308 (1973); *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 109 A.2d 331 (1954); and *Bortz Coal Company v. Commonwealth,* 2 Pa.Cmwlth. 441, 279 A.2d 388 (1971). Here, however, there was no decision on record by the agency.

state or federal *agency* orders incorporating such standards would be enforceable, was not (nor could be) decided.[18]

The lower court weighed the evidence properly before it in the contempt proceeding and determined that PPC was unable to comply with its order and that this noncompliance did not constitute deliberate defiance which a jail term or fine could break. Since this Court finds substantial evidence in the record to support the findings of the lower court and that the defense of impossibility was properly applied, we can find no abuse of discretion or error of law.

Order affirmed.

POMEROY, J., joins in this opinion.

EAGEN, O'BRIEN, ROBERTS and NIX, JJ., concur in the result.

---

18. In view of the elaborate procedures proscribed in both federal and state statutes for obtaining review of *agency* decisions (*e. g.,* DER or EPA decisions to grant variances, to pass, or to enforce state pollution rules and regulations), we have been particularly careful to satisfy ourselves that the lower court did not include in its decision a review of any agency actions.