Commonwealth of Pennsylvania, Appellant, *v.* United States Steel Corporation, Appellee. County of Allegheny, Appellant, *v.* United States Steel Corporation, Appellee.

Argued May 8, 1974, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Marvin A. Fein,* Special Assistant Attorney General, for appellant, Commonwealth of Pennsylvania.

*Gerald P. Dodson,* Special Assistant County Solicitor, with him *Thomas M. Rutter, Jr.,* Acting County Solicitor, for appellant, County of Allegheny.

*Blair S. McMillin,* with him *Robert L. Potter,* and *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY JUDGE KRAMER, September 6, 1974:

This is an appeal from an order of the Court of Common Pleas of Allegheny County, dated June 25, 1973, which reinstated that court's order of May 23, 1973. The lower court intended its May 23, 1973 order to "result in finding solutions leading to a resolution of the problems" confronting the parties (as well as the court) arising out of the filing by the Commonwealth of Pennsylvania and the County of Allegheny (Appellants) of a petition (as amended) for a Rule To Show Cause why United States Steel Corporation (USS) should not be found in civil contempt for violations of certain provisions of a consent decree dated September 25, 1972.

This case had its beginning when years of negotiations between the Appellants and USS failed to result in a plan satisfactory to the Appellants for the control of the emission of particulate matter and sulfur dioxide from USS's Clairton Works, located at Clairton, Pennsylvania. This plant is the largest by-product coke plant in the United States. On February 11, 1972, the Appellants filed a complaint in equity charging USS with, among other things, violating air pollution regulations. After months of negotiations, and conciliation before Judge Silvestri SILVESTRI of the court below, the Appellants and USS presented to Judge SILVESTRI a consent decree which he signed on September 25, 1972.[1]

A part of the consent decree called for its approval by the Federal Environmental Protection Agency (EPA), which approval was received on March 22, 1973.

---

[1] There were two other consent decrees both dated October 20, 1973 filed in this matter, but neither of these later decrees is at issue here.

As has been pointed out by the Appellants, USS, pursuant to Section 307 of the Clean Air Act, 42 U.S.C. §1857h-5(b)(1) and (2), could have petitioned the United States Court of Appeals for the Third Circuit for review of the standards in the consent decree which were subject to EPA approval. USS filed no such petition.

Subsequent to the filing of the September 25, 1972 consent decree, certain governmental inspectors on numerous occasions visited the Clairton Works to investigate compliance with the consent decree. As a result of their investigation, on March 27, 1973, the Appellants filed the petition now before us. In the petition and its amendment (filed April 5, 1973), the Appellants charge USS with violating four provisions of the consent decree, viz., paragraphs numbers 1-D, 1-E, 2-E and 10. These provisions read as follows:

1-D "On and after December 31, 1972, if a self-sealing oven door continues to leak fifteen (15) minutes after the oven is charged, it shall be adjusted, repaired or replaced prior to the next coking cycle which starts during the next daylight turn after the leak is discovered so that subsequent emissions are limited to the fifteen (15) minutes after charging.

1-E "On and after December 31, 1972, there shall be no visible emission, except non-smoking flame, from any opening on the coke oven doors from more than ten percent (10%) of the coke ovens in any battery at any time.

2-E "*Topside Emissions*—At all times after December 31, 1972, any leak discovered on the top side of a battery shall be immediately wet sealed or the oven shall not be recharged until the necessary repairs are made. At no time shall there be leaks in more than five percent (5%) of the offtake piping on any one battery. If in practice this standard cannot be attained the parties shall meet to discuss the standard. If the

parties are unable to reach agreement the issue shall be decided by the Court.

10 "Defendant shall maintain and operate the Clairton Works at all times hereafter in such a manner that the air contaminants therefrom are minimized to the greatest extent possible." In their petition the Appellants prayed (1) that a rule to show cause be issued; (2) that a hearing be set; (3) that a rule be entered to permit the Appellants to use cameras in their inspections; and (4) that they have all other relief available in an action for civil contempt to insure compliance with the consent decree. The answer of USS in effect alleged a good-faith attempt to comply and, specifically with regard to the allegations concerning paragraph 1-D, alleged "It is impossible to comply with the fifteen minute requirement of Paragraph 1-D as interpreted and enforced by plaintiff County."

This was an action for civil contempt and as such the appellants had the burden of proving, by clear and persuasive evidence, that USS had violated the provisions of the consent decree.

The lower court held six days of hearings including a judicial view of the Clairton Works, and on May 23, 1973, it filed its opinion and order in which it found that there was more than sufficient evidence to support its conclusion that USS was in violation of all four paragraphs noted above. The lower court, however, did not specifically find USS in contempt, and specifically stated it was not imposing any sanctions for violations. Instead, the court set forth in its order a procedure whereby technical teams would be appointed by the Appellants and USS to evaluate certain enumerated paragraphs of the consent decree and to report to the court monthly and finally on how or whether compliance with the consent decree could be accomplished by any means. It should be pointed out here that although the court made a finding that it was

obvious USS was in violation of the standards set forth in paragraph 1-D, it also made apparently inconsistent statements with respect to the Appellee's contention that compliance with paragraph 1-D is technologically impossible.[2] The precise status of Appellee's impossibility argument is thus not clear.

We have read and re-read the excellent opinion of the court below wherein it sets forth in great detail a clear description of the coking operations at the Clairton Works and the many very difficult and complex technical problems one would encounter in any attempt to eliminate particulate matter and sulfur dioxide from the burning infernos. A reading of the consent decree permits one to question the age-old adage "Where there is smoke, there is fire," for here there is a requirement that there must be no smoke (after 15 minutes) where there is an inferno of fire. We believe it fair to summarize the lower court's opinion by characterizing it as an attempt to solve the perplexing problem that arises when a governmental regulatory agency is asking too much and the regulated party is doing too little. The lower court's attempt to establish a program under which some of these very perplexing technical and scientific problems are to be resolved by experts at the conference table, subject to judicial surveillance, makes eminent good sense from a practical standpoint. Unfortunately, under the law and facts of this case, we believe such an attempt was contrary to the proper judicial function. We sympathize with the Judge of

---

[2] In one section of its opinion the lower court said, "The plaintiffs [appellants] conclude that the 15 minutes standard of 1-D could not be met and that there is no indication that it can be met as an absolute standard."

In another passage the court said, "What the parties have proved at this hearing is that they have not sufficient knowledge to know whether or not the aforesaid paragraphs of the decree can be complied with."

the lower court who was faced with novel inspection procedures designed and implemented by governmental employes who, though qualified from an educational standpoint, were novices working without sufficient guidelines from their governmental employer. On the other hand, these same governmental employes offered what appear to be practical suggestions for reducing pollution. USS chose to ignore them instead of embracing them in a spirit of cooperation. As happens all too often in current administrative law cases, both the regulators and the regulated expect the judicial branch of government to take them by the hand and lead them through the maze of confusion to a proper determination. Courts are not scientific experts in the field of air pollution and should not be called upon to solve the scientific problems which the regulators and the regulated should solve. Courts cannot become super environmental boards of review or departments of environmental resources. Courts are intended to decide cases on the record made and the applicable law.

This Court's scope of review is governed by the provisions of the Act of April 18, 1919, P. L. 72, §1, *as amended,* 12 P.S. §1165, under which we are directed to review the record to determine whether the court below abused its discretion or committed an error of law. *See Commonwealth of Pennsylvania, Department of Environmental Resources v. Pennsylvania Power Company,* 12 Pa. Commonwealth Ct. 212, 316 A. 2d 96 (1974). In *Groff v. Borough of Sellersville,* 12 Pa. Commonwealth Ct. 315, 317, 314 A. 2d 328, 330 (1974), we stated: "Our scope of review in equity matters is limited. The findings of fact of the chancellor will be reversed only where there has been manifest or clear error or a clear abuse of discretion."

As already stated, the order of the court upon which the subject petition was based was a consent decree.

The effect of such a decree was clearly stated in *Commonwealth v. Rozman*, 10 Pa. Commonwealth Ct. 133, 309 A. 2d 197 (1973) : "A consent decree is not a legal determination by the court of the matters in controversy but is merely an agreement between the parties. It is in essence a contract binding the parties thereto. Universal Builders Supply, Inc. v. Shaler Highlands Corporation, 405 Pa. 259, 175 A. 2d 58 (1961). As a contract, such a decree requires a mutual understanding of and concerted action by the parties. . . . A court has neither the power nor the authority to modify or vary the terms set forth in a consent decree, under such circumstances, in the absence of fraud, accident or mistake. . . . The consent decree derives its efficacy from the agreement of the parties and the approval of the chancellor. It bound the parties with the same force and effect as if a final decree had been rendered after a full hearing upon the merits." *See also Cooper-Bessemer Company v. Ambrosia Coal and Construction Company*, 447 Pa. 521, 524-25, 291 A. 2d 99, 100-01 (1972) and *Universal Builders Supply, Inc. v. Shaler Highlands Corporation*, 405 Pa. 259, 265, 175 A. 2d 58, 61 (1961). At this point in these proceedings, it makes no difference how distasteful the consent decree may be to USS. The fact remains that USS voluntarily entered into this agreement with the Appellants, and the agreement was approved by the lower court. We also call attention to the fact that paragraph 11 of the consent decree carries the following provision: "This Decree and any plan or schedule incorporated herein may be modified by agreement of the parties or by this Court upon petition by any party." Although USS obviously was not in full compliance with the standards contained in the consent decree, it did nothing to seek relief from any provision which it believed was too difficult or impossible to meet. This Court in *Commonwealth v. Pennsylvania Power Co., supra*, upheld, in a

contempt proceeding, the lower court's finding that, based upon substantial evidence, compliance with a decree of the court was in fact impossible. We also upheld the lower court's conclusion that therefore the president of Pennsylvania Power Company could not be imprisoned and that he and his company could not be assessed civil penalties. USS would now attempt to utilize that opinion of this Court, filed after the hearings in this matter, to excuse it under the principles there set forth. The *Pennsylvania Power* decision is inapposite here because in that case Pennsylvania Power undertook the burden of proving the impossibility and successfully discharged that burden, whereas, in this case, USS made no such attempt. While USS's answer alleges the affirmative defense of impossibility with respect to paragraph 1-D of the decree (and only paragraph 1-D), as the lower court noted in its opinion, USS presented no direct testimony, expert or otherwise, as to why it could not achieve compliance. In any event, it seems clear from the opinion and action of the lower court that the trial judge was in some manner seriously dissatisfied with USS's proof on this critical point.

We should also point out that in *Pennsylvania Power,* we admonished all regulated entities as to the dangers and risks involved in not petitioning the court for relief when the regulated entity ascertained the impossibility of compliance with the court order. That same admonition is applicable here. In *Pennsylvania Power* we said: "Although we conclude that PPC acted in good faith, we must at the same time mention the inappropriateness of the procedure followed by PPC in this case. A review of that procedure causes us to be very critical of the failure of PPC to contest the possibility of performance by way of an appeal from any of the DER orders. This tack created a dangerous risk; for if the court below had found that any method

for reducing $SO_2$ emissions from PPC's smokestacks was possible to install, this Court would have had no alternative but to uphold the requested sanctions for contempt." 12 Pa. Commonwealth Ct. at 221, 316 A. 2d at 101.

The affirmative defense of impossibility was available to USS in this case even without a modification of the consent decree, but by failing to petition the lower court for a modification of the decree USS had to assume the burden of showing impossibility. If the real essence of USS's contention is that the questioned portions of the decree may be impossible to comply with, or were accepted by USS and the Appellants while both parties were laboring under mistaken beliefs as to the economics or feasibility of compliance, then the proper course would be to seek a modification. Absent this, or a specific court finding of impossibility, the lower court has very little choice but to find the defendant in contempt, given conduct which fails to comply with the decree.

We hold then that the consent decree is binding upon USS and that the court below was in error in *sua sponte* ordering further study and reports to the end of receiving recommended modifications to the consent decree. That decree must stand until changed by the court upon submission of amendments by the parties or under the provisions of paragraph 11, quoted above. As laudatory as the lower court's intended purpose may be, it was improper for it to undertake what USS should have done if USS believes that the consent decree is in need of modification. One of the purposes of civil contempt proceedings is to coerce the alleged contemnor into compliance with an order of court, *Brocker v. Brocker*, 429 Pa. 513, 521, 241 A. 2d 336, 339 (1968), and until such time as that order is properly modified, the complaining party is entitled to

invoke the equity powers of the court to see that it is obeyed.

It is not for this Court to make specific conclusions of law on whether USS should be found in civil contempt for violations of the four specific paragraphs of the consent decree involved; rather, that is the task of the lower court. We reiterate that the lower court's statements with respect to the impossibility of compliance with paragraph 1-D of the consent decree appear to be inconsistent. It is also not the duty of this Court to determine the amount of civil penalty, if any, to be assessed against USS for any violations which the lower court finds as a matter of law to be civil contempt. USS's good faith attempt at compliance, of course, should be taken into consideration in determining the amount of any penalty. On remand, therefore, the lower court will be directed to make specific findings on each of the allegations made by the Appellants as they pertain to the four paragraphs of the consent decree. The lower court will likewise state its conclusions of law as they pertain to each paragraph, and will assess whatever civil penalties, if any, it deems appropriate for each proven violation.

In summary, we hold that the case presented to the court below should be restricted solely to the determination of (1) whether USS was in violation of the four subject provisions of the consent decree; (2) whether as a matter of law USS should be held in civil contempt for any such violations; and (3) whether any civil penalties should be assessed against USS for any such contempt violations. The court was in error in attempting, *sua sponte*, to conciliate the matter or to determine whether the consent decree was in need of modification. This is so in spite of the laudability and common sense of such an approach. We therefore

## ORDER

AND NOW, this 6th day of September, 1974, based upon the above discussion, it is ordered that the order of the Court of Common Pleas of Allegheny County dated May 23, 1973, in the above-captioned matter be and is hereby set aside; and this matter is remanded to that court for further hearing if, in the discretion of the court, that be deemed necessary to enable it to make findings of fact and conclusions of law as they pertain to the alleged violations of paragraphs 1-D, 1-E, 2-E and 10 of the consent decree dated September 25, 1972, and for a determination of whether United States Steel Corporation should be held in contempt for any such violations and whether any civil penalties should be assessed against United States Steel Corporation for any such contempt violations, all of which is to be consistent with the opinion filed herewith.