Commonwealth of Pennsylvania, Department of Environmental Resources, Appellant, *v.* Pennsylvania Power Company, Appellee.

Argued December 3, 1973, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

*Marvin A. Fein,* Special Assistant Attorney General, for appellant.

*William R. Balph, Jr.,* with him *Chambers, O'Neill, Nicolls & Balph,* for appellee.

OPINION BY JUDGE KRAMER, February 28, 1974:

This is an appeal filed by the Commonwealth of Pennsylvania, Department of Environmental Resources (DER) from an order of the Court of Common Pleas of Lawrence County (dated April 19, 1973) dismissing DER's petition and rule to show cause why Pennsylvania Power Company (PPC) and Ray E. Semmler, President of PPC (Semmler), should not be adjudged in contempt of court. This case involves very important first impression questions of law concerning the enforceability of unappealed orders of a regulatory agency (and an order of court) where, in a contempt proceeding for noncompliance, there is a finding of impossibility of performance by a court.

After a complete study of this entire record and upon analysis of the many technical, scientific and engineering points contained therein, it was tempting to issue a per curiam opinion affirming the order of the court below based upon its excellent opinion. However, because of the additional emphasis placed by counsel in their briefs and in arguments before this Court on the legal question concerning the defense of impossibility of performance of a court order in a contempt proceeding, we believe it necessary to file a complete opinion disclosing the basis of our holding. In order to facilitate an understanding of that holding, it is necessary to set forth certain pertinent facts taken from the record and for the most part determined in the findings of fact of the court below.

PPC is a duly certified public utility rendering electric service to the public in western Pennsylvania. It owns and operates an electric generating plant in the Village of West Pittsburg in Lawrence County. The plant has a production capability of 430 megawatts utilizing five coal-fired steam boilers, which were installed between 1939 and 1964. Following the receipt of several complaints (some dating back to at

least 1962), officials of DER (and its predecessor agencies) conferred with officials of PPC in an attempt to alleviate the problem through particulate control devices being placed in or attached to the smokestacks. In an attempt to comply with the regulations of DER, PPC installed two new electrostatic precipitators and replaced three mechanical dust collectors with electrostatic precipitators so that the particulate collection efficiency for all of the stacks was set at 98 percent. On January 28, 1969, the Pennsylvania Air Pollution Commission adopted Regulation V, which increased the particulate collection efficiency to 99 percent. On April 22, 1970, the Department of Health issued an order requiring PPC to comply with the Regulation V provisions. It should be noted at this point that in 1970 there were no regulations for the control of sulfur dioxide ($SO_2$). PPC filed an appeal from this order with the Air Pollution Commission and a hearing was held. At the hearing (October 15, 1970), it was PPC's contention that it should not be required to meet the new provisions of Regulation V until after the Commonwealth's environmental regulatory agencies promulgated new regulations for the control of $SO_2$, which were then under consideration. On January 11, 1971, the Air Pollution Commission rejected the contention of PPC and affirmed the order of the Department of Health, extending the time for compliance to June 1, 1971. PPC took no appeal from this adjudication.

By agreement of the parties, the date for compliance was extended to September 1, 1971, and no further extensions were ever granted. Further conferences were held, with no concrete results. Thereafter, on January 12, 1972, DER filed a complaint in equity in the Court of Common Pleas of Lawrence County praying for an order which would mandate compliance with the order of the Air Pollution Commission of January 11, 1971. Just two weeks after the filing

of this suit, on January 27, 1972, the Environmental Quality Board of DER promulgated its regulations for the control of $SO_2$ and further amended the regulations with respect to particulate matter. After hearing, the court granted the Commonwealth's motion for a preliminary injunction and on August 7, 1972 and September 1, 1972, the court issued an order which went beyond the prayer of the original petition in that the court took cognizance of the newly adopted (January 27, 1972) regulations and ordered PPC to comply therewith. It ordered PPC to file a plan for compliance by October 7, 1972. It is again to be noted and emphasized that PPC did not take an appeal from any of the orders of court. However, in October 1972, PPC submitted a timely application for approval of its plan to comply with the court order. The record indicates that PPC's application provided for compliance with the particulate control provisions of DER's regulations, but that it did not contain any specific control mechanisms for the removal of $SO_2$, as required by the new regulations and the court order. Instead, PPC's application provided for the construction of high stacks in order to control $SO_2$ emissions, and PPC takes the position that such stacks were the only means available to control such emissions.

DER neither rejected nor accepted the application, nor did it request additional information or conferences concerning the application. Instead, on November 20, 1972, DER filed the petition for contempt which instituted the proceeding presently before this Court on appeal. In its complaint, DER set forth generally the facts noted above and prayed for "the incarceration" of Semmler "in a penal institution until such time that the Order of September 1, 1972 is complied with by Penn Power" and the imposition of a fine of twenty-five thousand dollars per day against Penn Power and Semmler until said order was complied

with. After a complete hearing, the court below on April 19, 1973, dismissed the complaint on the basis that it was "impossible" for the defendants to comply with that portion of the court's order requiring the control of $SO_2$ emissions under the provisions of "Title 25, Chapter 123, Sections 11 and 22 of the Rules and Regulations." The court further concluded that the conduct of the defendants did not represent a "willful disregard or disobedience" of the court's orders, that the defendants should not be found in contempt, and that PPC's application, as filed, should be incorporated into the court's order of September 1, 1972 as compliance.

In its appeal to this Court, DER challenges the power of the court below to consider the validity of its original order, when that order had never been appealed from and neither party has filed a motion to modify or dissolve the order. DER also challenges the power of the court to substitute its own judgment for that of DER in reviewing rules and regulations requiring minimum limitations on $SO_2$ emissions. Additionally, DER contends that the evidence of record does not support the court's conclusions that compliance with the orders of DER and the court (September 1, 1972) was impossible and that PPC had acted in good faith in filing its application.

Our scope of review is governed by the provisions of the Act of April 18, 1919, P. L. 72, §1, as amended, 12 P.S. §1165. Under these statutory provisions, we are directed to review the entire record to determine whether the court below abused its discretion or committed an error of law. In *Commonwealth ex rel. McClintock v. Kelly*, 307 Pa. 525, 161 A. 737 (1932), our Supreme Court discussed the similar predecessor act, Act of April 18, 1919, P. L. 72, 12 P.S. §1165, and found that it requires us in contempt cases to determine whether each finding of fact made by the court

below had any substantial evidence to support it or could be deduced fairly from the record. Our very careful review of this entire record permits us to conclude that each and every finding of fact made by the court below is supported by substantial evidence.

The basic or controlling finding of the court below is that the order of court (dated September 1, 1972) ordering PPC to comply with the $SO_2$ regulations of DER was impossible of conformance. Although DER presented testimony of witnesses who believed that in theory it was possible for PPC to construct equipment to meet and conform to the $SO_2$ regulations, this testimony was weakened by vacillation during cross-examination and contradicted by the direct testimony of PPC's witnesses, which the court below was required to evaluate. The record indicates that all of the $SO_2$ control equipment, whether found in Japan, in other foreign countries, or in this country, was either (1) of a different size, which experience in the art proved to be significant, or (2) used a different fuel (usually low sulfur) not available to PPC, or (3) failed to produce the desired results, causing either abandonment of the project or extensive redesign and alteration, or (4) was experimental and not proven to be satisfactory at the date of the hearing. All of the technical witnesses seemed to be of the opinion that it would be necessary for a pilot project to be operated successfully for a period from six months to one year before the equipment could be said to be commercially available. The record also discloses another problem which the DER witnesses seemed to say could be solved in theory, but which has not been solved in practice; and that is the disposition of the residue or sludge or sulfuric acids resulting from all of these $SO_2$ removal and control devices. For example, the Japanese plant referred to in the record dumps its residues into a stream or the sea. Such disposal would

be completely unsatisfactory in this Commonwealth. It is interesting to note that in this entire record, which discloses historical interaction between DER and PPC, there is not one word concerning any concrete directions or suggestions by any official or employe of DER on how PPC was to reduce $SO_2$ emissions. DER contends that its responsibility is to issue mandatory rules, regulations and orders without regard as to whether they are possible of performance. This contention may be correct, but it does not mean that a court, in a contempt proceeding, must also pay no regard to possibility of performance. We find that the record contains substantial evidence to support the lower court's conclusion that PPC could not possibly comply with that portion of the court order relating to $SO_2$ emissions at the time of the trial.

DER contends that the evidence of record does not support the conclusion of the court below that PPC acted in good faith in filing its application. According to DER, there are only two methods of complying with its $SO_2$ regulations. They are (1) the use of low sulphur fuel or (2) the installation of a flue gas scrubbing device. The record certainly supports the conclusion of the court below that low sulphur fuel is not available to PPC. Recognizing that DER tried this case and wrote its briefs prior to the current energy crisis, it is still noteworthy that DER complained over PPC's refusal to rely upon foreign oil supplies. Recent events certainly attest to the wisdom of PPC's management and the court below in their concern about such foreign oil supply. Whether or not the court was correct in its observation that this case presents a classic example of the Peter Principle, the fact remains that one of the two methods suggested by DER is certainly not available to PPC. As already pointed out, the flue gas scrubbing devices suggested by DER are available in theory only, and are not available and proven from

an operational or practical standpoint. For instance, DER refers several times in the record to the installation by Duquesne Light Company at its Phillips Power Plant of a sulphur dioxide venturi-type wet scrubbing system; however, at the argument before this Court, counsel for DER frankly admitted that Duquesne's attempt to make this sixty million dollar system work satisfactorily has met with failure. DER also points to the fact that PPC has joined with other utilities in in the installation of such a system at the mammoth Mansfield plant where the pollution control devices will cost an estimated ninety-two million dollars out of a total estimated construction cost of four hundred forty million dollars. The record indicates that PPC has joined in this tremendously expensive experimental attempt to control sulphur dioxide in spite of grave reservations concerning its success. The record conclusively shows that the electric industry, at the direction of governmental regulatory agencies, is spending hundreds of millions of dollars of consumers' money in attempts to abate air pollution. There is no way the record in this case would permit anyone to conclude that PPC is not cooperating or, to put it another way, is acting in bad faith in its attempts to meet the regulations of DER.

There is another procedural aspect to this case which is puzzling to the Court. The lower court's order in the injunction case dated September 1, 1972, refers to approval by the "Bureau" of the plan to be submitted by PPC. The record indicates that there was never any approval or disapproval communicated to PPC of the plan filed in October of 1972. The testimony of DER in the contempt proceeding indicates that Richard H. Zinn, who is the regional air pollution control engineer for Region 6 (which includes Lawrence County) is the employe of DER who received the October 1972 application of PPC. There is nothing in this record

to indicate whether DER or the "Bureau" passed upon this application. The record indicates that Mr. Zinn alone passed upon the acceptability of the application. He stated that it was *his* opinion that the application would not meet the SO₂ standards set forth in Section 22, and that *he* decided that there was not sufficient engineering data submitted for *him* to make a judgment on the particulate removal plan submitted. He further admitted that he would have been able to determine the sufficiency of the application with additional technical information. He frankly admitted that such additional information was not requested. Instead, DER proceeded with its contempt proceeding complaint. Zinn also stated that it is not the policy of DER to assist citizens in solving pollution problems but rather only to enforce the regulations. This record shows a rather startling lack of communication between DER and PPC but it in no way supports a conclusion that PPC did not act in good faith in filing its application.

Although we conclude that PPC acted in good faith, we must at the same time mention the inappropriateness of the procedure followed by PPC in this case. A review of that procedure causes us to be very critical of the failure of PPC to contest the possibility of performance by way of an appeal from any of the DER orders. This tack created a dangerous risk; for if the court below had found that any method for reducing SO₂ emissions from PPC's smokestacks was possible to install, this Court would have had no alternative but to uphold the requested sanctions for contempt. The failure to take the administrative procedural protections available to a citizen from an order of a regulatory agency is not to be condoned. It was likewise questionable for PPC not to take an appeal from the order of court dated September 1, 1972, which ordered compliance with DER's SO₂ regulations. DER's injunction petition requested enforcement of the particulate regu-

lation in existence on January 12, 1972 (i.e., §11 of Chapter 123 of Title 25 of the Rules and Regulations of DER). It was only after the lawsuit had been filed that DER promulgated Section 22 regulations dealing with $SO_2$ emissions. The court ordered compliance with these new regulations even though DER had not yet ordered PPC to comply with them. It would appear that DER was satisfied with the October 1972 application of PPC insofar as it complied with the particulate regulations. However, PPC must have realized that its application did not constitute compliance with that portion of the court order pertaining to $SO_2$ emissions. PPC should have appealed the court order and raised the issue of possibility of performance in its appeal.

A careful reading of the record shows that the court below was aware of the difficulties PPC faced in attempting to comply with the court order. The amended order of court of September 1, 1972, reads as follows:

"It appearing, as the result of briefs submitted and oral argument, that since the institution of this suit, the Commonwealth of Pennsylvania has enacted new regulations governing particulate matter emissions and relating to the control of sulphur dioxide, and it further appearing that the defendant, Pennsylvania Power Company, is willing to comply with the newly enacted regulations in these matters, it is now therefore ORDERED, ADJUDGED and DECREED that:

(1) Within sixty (60) days from August 7, 1972, defendant [PPC] shall submit to the Bureau an application pursuant to the provisions of Title 25, Chapter 127, Section 11 of the Rules and Regulations for the construction or installation of air pollution abatement equipment at tis [sic] electrical generating station in Taylor Township to control particulate matter emissions and sulphur dioxide emissions to within the limits specified in Title 25, Chapter 123, Sections 11 and 22

of the Rules and Regulations. Upon approval by the Bureau, the approved plan shall become incorporated as a part of this Order.

(2) The air pollution abatement equipment in the above approved plan shall be installed and operating in compliance with a permit issued under Title 25, Chapter 127, Section 21 of the Rules and Regulations, by July 1, 1975.

It is further ordered that a Decree supplemental hereto shall be entered dealing with defendant's responsibility to comply with the adjudication of the Air Pollution Commission dated January 11, 1971, in lieu of defendant being required to apply for a variance under Title 25, Chapter 141 of the Rules and Regulations."

There was also a supplemental order of court, not specifically mentioned by DER, which amended the above-quoted order. In the December 12, 1972 supplemental order, specific provisions were made restricting the type of fuel to be burned during specific periods. That order concludes with the following very interesting provision:

"5. Notwithstanding the provisions set forth in paragraph three above, if defendant's compliance with the provisions of paragraph three above became *impossible* due to third-party inadequacies or third-party supplier's inability to supply materials necessary for defendant's compliance, then during such periods, defendant may be excused from complete compliance herewith upon a proper showing to this Court." (Emphasis added.)

This supplemental order was, of course, issued subsequent to the filing of the petition for contempt, but before the first hearings on the contempt petition. The point is that in this supplemental order, the court below was conscious of the fact that it might be impossible to comply with some portions of its order.

Another contention of DER is that the court below erred by substituting its own judgment for that of DER in reviewing a DER regulation. There is no merit to this contention. In this contempt proceeding the validity and wisdom of the DER regulations are not at issue. The question is not whether PPC failed to comply with DER's regulations; rather, the question is whether PPC and its president can be found to be in contempt of court for a failure to perform the affirmative duties and responsibilities placed upon PPC by the court. In other words, it is for the court to determine whether PPC has violated a court order and not whether PPC has satisfied DER.

At the argument before this Court, it was the position of DER that the courts should only look to determine whether there has been performance of an unappealed order of court. DER argues that if possibility of performance could have been raised at the hearing on the injunction, then this defense cannot be raised in a hearing for contempt because of failure to fully perform the order of the court. Counsel for DER quite frankly stated that the defense of impossibility of performance is not available to PPC in light of its failure to either appeal the original injunction order or to seek a modification of it. We find no merit in this argument. The purpose of sanctions in a civil contempt proceeding of this nature is "to coerce the defendant into compliance with the court's order" and therefore in such a proceeding a court must consider "the probable effectiveness of any suggested sanction in bringing about the result desired". *Brocker v. Brocker*, 429 Pa. 513, 521, 241 A. 2d 336, 339 (1968). To impose sanctions on PPC in an attempt to force it to perform an impossible act would be both meaningless and unjust.

The defense of impossibility of performance is available to a defendant in a contempt proceeding. It has

been held that where the defendant cannot perform the duty ordered, and where that inability is not due to the actions of the defendant himself, that impossibility is a defense. *F. T. C. v. Baine,* 308 F. Supp. 932 (N. D. Ga. 1970), *Arlington Seating Co. v. New Philadelphia School District,* 317 Pa. 179, 176 A. 221 (1935).

DER cites *Bortz Coal Co. v. Commonwealth,* 2 Pa. Commonwealth Ct. 441, 279 A. 2d 388 (1971) and *Commonwealth v. Harmar Coal Co.,* 452 Pa. 77, 306 A. 2d 308 (1973) for the proposition that impossibility of performance is not a defense. Our review of these two cases permits us to conclude that this Court and our Supreme Court have held in those cases that the rules and regulations of DER must be reasonable. In neither of these cases did the respective companies challenge the reasonableness of the regulation as PPC has done in this case. Therefore, these cases are inapposite for DER's purposes. DER's reference to *Bortz* and *Harmar* does raise a question in our minds, however, on where the lines must be drawn on constitutional rights and consistency. As the record specifically indicates in this case, under DER's approach to PPC's air pollution problems at West Pittsburg, the company was faced with only two alternatives. It either had to file an application as reasonably close to compliance as the art and technology permit or close the plant down. DER's position in the coal mine and coke oven cases was to close them down. The practical end result of the *Bortz* case was to put out of business all beehive coke ovens in the Commonwealth because the record showed that no such operation could comply. In this case, however, DER, for obvious reasons, does not suggest closing down an electric plant. Instead, DER seeks to place in jail the president of PPC and fine the company and its president twenty-five thousand dollars per day until such time as the engineers, technicians and other air pollution experts find a practical and operative solu-

tion to the problem or in the alternative, until PPC gambles the revenues of its consumers on pollution control equipment which to this date has not been proven successful anywhere in the world. There is no way the court below or this Court can permit such a travesty of justice, especially since we must presume, in ascertaining legislative intent, "that the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." *See* Statutory Construction Act of 1972, 1 Pa. S. §1922.

One remaining word on impossibility must be included, as it applies to the use of higher smokestacks by PPC to control $SO_2$ emissions. PPC contends that this proposal was the only available practical solution which would meet as closely as possible the $SO_2$ regulations of DER. Although DER contends that higher stacks will not meet fully the regulations of Section 22 (and the record fully supports that contention), the record supports the lower court's findings and conclusions that under the present state of technology the higher stacks proposed by PPC in its October 1972 application are as close as PPC can come to compliance with such regulations.

In summary, because of the extraordinary importance of this case, we have expended considerable time reading and rereading this record together with the applicable law, and we can come to no other conclusion than that there is substantial evidence in the record to support all of the findings of the court below. Therefore, it did not abuse its discretion. Furthermore, the defense of impossibility was properly applied in the contempt proceeding, and therefore, the court below did not commit an error of law. We must affirm.