Rochez Bros., Inc., d/b/a Lucerne Coke Co., Appellant, *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Appellee.

138

Argued January 6, 1975, before President Judge
BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKIN-
SON, JR., MENCER, ROGERS and BLATT.

*Ralph H. German,* with him *William S. Smith* and
*Houston, Cooper, Speer & German,* for appellant.

*Eric R. Pearson,* Special Assistant Attorney General,
for appellee.

OPINION BY JUDGE KRAMER, March 19, 1975:

This is an appeal filed by Rochez Brothers, Inc., d/b/a Lucerne Coke Company (Lucerne) from an order of the Environmental Hearing Board (Board) dated March 25, 1974 which affirmed the refusal by the Department of Environmental Resources (DER) to approve Lucerne's application to reactivate its beehive coke ovens.

Most of the basic facts are not in dispute. In 1952, 264 beehive coke ovens[1] were constructed about one and a half miles northeast of Homer City in the County of Indiana. The ovens are located in a valley along a stream and against a steep hillside which rises for 100 to 200 feet immediately to the north of the coke ovens. The prevailing wind direction is from the south. The coke ovens are located in what may be described as a rural area with about six inhabited houses located in the village of Tide some 200 yards to the southeast of the operation and an uninhabited farm now used for the growing of pine trees immediately to the north. The beehive coke ovens were in continuous operation from 1952 until August 11, 1971, except for one short interval. High volatile coal was burned in these coke ovens until

---

1. According to the record there are two classes of coke ovens. The first is commonly known as the recovery or by-product coke oven which captures the emissions from the coking process in order to obtain by-product materials. The second class is the nonrecovery type exemplified by push ovens or rectangular ovens and beehive ovens (the latter being the type involved in this case). A beehive coke oven is circular in design so as to permit the largest volume obtainable from a 14-foot diameter oven with a dome top. It is constructed with high-temperature resistant ceramic materials with a charging hole in the top called a trunnel ring. The coke-making process is basically that of driving off volatile materials contained in coal through heat and controlled oxygen. Coke is actually carbonized coal. The record indicates that during the coking process in a beehive oven approximately 25% of the weight of the coal (low volatile coal) is driven off (either in gaseous form or as particulate matter) and is emitted into the atmosphere.

1967 and thereafter low volatile coal (which gives off less emissions) was burned. Originally coal was obtained from a mine in close proximity to the ovens, but later the low volatile coal was obtained from a mine located at Barnesboro some miles away. Between 1965 and August 11, 1971, all but 53 of the ovens had been renovated and repaired by the relining of the ovens on the inside and the rebuilding of the oven walls on the outside.

In the operation of a beehive coke oven, a fire is started inside the oven with wood, oil and a low grade of coal. After the oven reaches the desired temperature of approximately 2,000 degrees Fahrenheit, metallurgical coal is charged into the oven through the trunnel ring. The carbonization of the coal then begins and the oven is partially sealed, allowing a controlled amount of oxygen to enter for the carbonization process. During the first several hours of the process, after the charging of the oven, great amounts of smoke, gases and particulate matter are released into the air. Thereafter the amount of emissions becomes reduced and the process continues from between 72 to 120 hours, after which the discharge door is torn down, the coke sprayed with water and then removed from the oven.

The record indicates that Lucerne's coke ovens, if activated, would produce about 750 tons of metallurgical coke each day from about 1,300 tons of coal (an average yield of about 57%).[2] The record in this case shows that the emissions from Lucerne's coke ovens are the minimum emission possible through the use of the best available technology on beehive coke ovens. However, the record also establishes beyond any doubt that there is no technology available at the present time to

2. The record indicates that the total yield of coke is actually 75% of the tonnage of coal used, but that a certain percentage of the yield is either too small or too large to be sold as metallurgical coke. Thus the actual yield of metallurgical coke is only 57%.

control emissions from beehive coke ovens, and Lucerne does not contend that its ovens will meet the applicable environmental regulations.

On August 15, 1973, Lucerne submitted an application to reactivate its 264 beehive coke ovens for a minimum period of two years for the purpose of supplying the Jones & Laughlin Steel Corporation (J&L) blast furnaces located at Pittsburgh, Aliquippa and Cleveland. The application noted that the reason the coke ovens had been shut down on August 11, 1971 was that the demand for metallurgical coke had declined, but stated that due to the energy crisis there is now a "dire need" for metallurgical coke. On October 5, 1973 DER refused to approve the application for reactivation of these coke ovens because Lucerne had not provided any information which showed that the beehive coke ovens would meet the limitations set forth in the DER regulations applicable to fugitive emissions.[3] Lucerne appealed to the Board admitting that it could not meet the technical standards set forth in the DER regulations but arguing that DER had erred in not taking into account the economic factors involved in the proposed reactivation. In the hearing before the Board Lucerne presented extensive testimony concerning the operation of its coke ovens and the allegedly dire need for this coke in J&L's blast furnace operations. The testimony indicated that J&L might be forced to close down one or more of its blast furnaces unless it is assured of an adequate coke supply, and that if this occurred it would mean the loss of a substantial number of jobs.

In its well-reasoned opinion, the Board made 32 findings of fact, and concluded that DER had not erred in refusing to approve Lucerne's application to reactivate its beehive coke ovens. On appeal to this Court, Lucerne argues that the Board's findings are not supported by

---

3. See 25 Pa. Code §§ 123.1, 123.13, 123.31 and 123.41.

substantial evidence, that the Board committed error in not taking into account the economic impact of DER's refusal and lastly, that the regulations involved, with which beehive coke ovens cannot possibly comply, are unconstitutional because they result in a taking of Lucerne's property without due process of law.

Our scope of review on appeal from the Board is limited to whether constitutional rights were violated, an error of law was committed, or any necessary finding of fact was not supported by substantial evidence. *See Department of Environmental Resources v. Leon E. Kocher Coal Company,* 9 Pa. Commonwealth Ct. 110, 305 A.2d 784 (1973). We have carefully reviewed the record and we conclude that all of the findings of fact made by the Board are supported by substantial evidence.

Lucerne contends that there have been few bona fide complaints concerning air pollution from the subject beehive coke ovens and alleges that almost all of the complaints present in the record are a result of DER's affirmative solicitation. The record indicates that DER did solicit most of the complaints and, also, that DER attempted, unsuccessfully, to encourage attendance at a hearing concerning Lucerne's ovens. We believe that DER acted properly in attempting to determine the adverse effects, if any, of these coke ovens on the surrounding community, but we question the propriety of an administrative agency allowing an investigation to become an active attempt to rally public support for its position. DER's actions, however, even if improper, do not affect the result in this case because we believe that both DER and the Board were required, as a matter of law, to deny Lucerne's application to reactivate.

The Air Pollution Control Act (Act), Act of January 8, 1960, P.L. (1959) 2119, *as amended,* 35 P.S. §4001 et seq., sets forth the authority of DER to issue or refuse permits for the operation of property coming within the Act. Section 6.1 of the Act, 35 P.S. §4006.1, reads in pertinent part:

"(a) On or after July 1, 1972, *no person shall* construct, assemble, install or modify any stationary air contamination source, or install thereon any air pollution control equipment or device or *reactivate any air contamination source after said source has been out of operation or production for a period of one year or more unless such person has applied to and received from the department written approval so to do. . . .*
"(b) No person shall operate any stationary air contamination source which is subject to the provisions of subsection (a) of this section unless the department shall have issued to such person a permit to operate such source in response to a written application for a permit submitted on forms and containing such information as the department many prescribe. *No permit shall be issued to any applicant unless* it appears that, with respect to the source, the requirements of subsection (a) of this section have been met *and that there has been performed upon such source a test operation or evaluation which shall satisfy the deparment that the air contamination source will not discharge into the outdoor atmosphere any air contaminants at a rate in excess of that permitted by applicable regulation of the board, and which will not cause air pollution. . . ."*

\*   \*   \*   \*

"(d) *The deparment may refuse to grant approval* for any stationary air contamination source subject to the provisions of subsection (a) of this section or to issue a permit to operate such source *if it appears, from the data available to the department, that the proposed source, or proposed changes in such source, are likely either to cause air pollution or to violate any board rule or regulation applicable to such source, or if, in the design of such source, no provision is made for adequate facilities to conduct source testing. . . ."* (Emphasis added.)

There can be no question that the application of Lucerne in this case did not carry out the requirements of section 6.1 quoted above. There was no test operation or any evaluation conducted which would indicate that Lucerne's reactivated coke ovens would meet the regulations established by the Environmental Quality Board. Nor was any provision made for facilities to conduct source testing. Also DER possesses data which indicates that beehive coke ovens cannot comply with the applicable regulations. We believe that section 6.1 of the Act, quoted above, together with the applicable regulations, required DER and the Board to deny Lucerne's application regardless of economic consequences. DER and the Board may not waive a mandatory provision of the Act (section 6.1(b)) because of adverse economic consequences.

Lucerne attempts to utilize decisions of this Court and the Supreme Court of our State in order to support its contentions that the regulations are unconstitutional as applied in this case, and that economic necessity requires that its application be approved. Lucerne first points to *Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 306 A.2d 308 (1973) where our Supreme Court was asked to determine whether the coal company could legally be compelled to treat acid mine drainage which was pumped from an adjacent, inactive mine, and discharged in order to protect the operation of Harmar's own mine. Lucerne finds support for its position in the Supreme Court's statement in *Harmar* that:

"[t]his is not an extreme case where, in the interest of public health and safety, the owner is prohibited from using his property. . . . Here the prohibition upon the enterprise of mining is not absolute, but only makes its operation more expensive." 452 Pa. at 94, 306 A.2d at 317-318.

Lucerne argues that in this case the regulations create an absolute prohibition and concludes that our Supreme Court would have reached a different result if total pro-

hibition had been present in *Harmar*. What Lucerne fails to recognize is that in *Harmar* our Supreme Court also said:

> "A State in the exercise of its police power may, within constitutional limitations, not only suppress what is offensive, disorderly or unsanitary, but enact regulations to promote the public health, morals or safety and the general well-being of the community. . . . This power has been used to prevent industrial practices in the use of private property which were injurious to the public. . . . The police power may even be exercised over property and current business operations, requiring the destruction of existing property. . . ." (Citations omitted.) 452 Pa. at 92, 306 A.2d at 316-317.

This Court has previously dealt with the problem of beehive coke ovens in the *Bortz Coal Company* cases.[4] In *Bortz I* we stated:

> "There is no prescriptive right to cause injury to another, and this basic premise has existed every day of the operation of these coke ovens. They were always subject to that prohibition. In the Air Pollution Control Act, supra, the Legislature has established that certain air pollution is injurious to the public health, welfare and safety, and, now, it need only be determined whether or not these technical standards which were set by the Commission are reasonable, so as not to violate Bortz's constitutional rights." 2 Pa. Commonwealth Ct. at 452, 279 A.2d at 395.

We specifically noted in both *Bortz* cases, *supra,* that the coke oven operator involved there had not challenged the reasonableness of the regulations. Lucerne seizes upon this point and contends that in this case it is challenging

---

4. *Bortz Coal Company v. Commonwealth*, 2 Pa. Commonwealth Ct. 441, 279 A.2d 388 (1971) (hereinafter Bortz I) ; *Bortz Coal Company v. Department of Environmental Resources*, 7 Pa. Commonwealth Ct. 362, 299 A.2d 670 (1973).

the reasonableness of the regulations. We do not agree. A proper challenge to the reasonableness of the regulations would have to be based upon a claim that they are unnecessarily stringent and unnecessary for the protection of the public health, safety and welfare. In this case Lucerne presented evidence of little or no complaints by persons living in the vicinity of the coke ovens, of little or no damage to adjacent foliage or property, and of possible economic loss to the community if the ovens are not operated. Lucerne does not seriously contend, however, that the regulations are unreasonably stringent and unnecessary for the protection of the public health, welfare and safety. If Lucerne had proven that its proposed emissions would not pollute the air, or that the particulate matter, smoke and gases emitted would not harm humans, animals or vegetation, or even that the amount of the proposed emissions could reasonably be expected not to do any such harm, then it would have presented issues properly challenging the reasonableness of the regulations. This, it did not do.

Lucerne points to the opinion of this Court in *Commonwealth of Pennsylvania, Department of Environmental Resources v. Pennsylvania Power Company,* 12 Pa. Commonwealth Ct. 212, 316 A.2d 96 (1974) as support for its contention that if it is impossible to comply with the regulations then the regulations cannot be enforced. This reasoning is fallacious for the reason that the *Pennsylvania Power* case dealt with contempt proceedings arising out of an equity action, and the validity of DER's regulation was not specifically at issue. In *Pennsylvania Power* we decided that under the law, the defense of impossibility of performance was available to a defendant in a contempt proceeding, where his inability was not of his own making. This case and *Pennsylvania Power, supra,* are not alike, either substantively or procedurally.[5]

---

5. In *Pennsylvania Power, supra,* we noted that DER is

Our Supreme Court in *Commonwealth v. Barnes &
Tucker Company*, 455 Pa. 392, 319 A.2d 871 (1974) re-
viewed the power of DER to enjoin acid mine drainage
from abandoned mines. In that case the Court discussed
the question of whether the regulations requiring abate-
ment of such mine drainage constituted a taking of prop-
erty without just compensation, a point which is raised
by Lucerne in this case. The *Barnes & Tucker* Court
stated:

"Whether it is a 'taking of property' to require
Barnes & Tucker to treat or abate the discharge from
Mine No. 15 is a more difficult question. The power
of the Attorney General to abate public nuisances is
an adjunct of the inherent police power of the Com-
monwealth. There is often a thin line separating that
which constitutes a valid exercise of the police power
and that which constitutes a taking. The United
States Supreme Court has abnegated any generally
applicable standards in this area, but the classic rule
of Lawton v. Steele, 152 U.S. 133 (1894), is instruc-
tive.

" 'To justify the State in . . . interposing its au-
thority in behalf of the public, it must appear,
first, that the interests of the public . . . require
such interference; and second, that the means are
reasonably necessary for the accomplishment of
the purpose, and not unduly oppressive upon in-
dividuals.' Id. at 137.

"From our prior discussion it is clear that the
public interest requires the interposition of the Com-

inconsistent in its approach to public utilities as opposed to bee-
hive coke ovens. DER attempts to coerce public utilities into com-
pliance with the regulations, but DER's policy toward beehive
coke ovens seems to be directed to putting them out of business and
keeping them out of business. This inconsistent approach is some-
what troublesome but we believe it is legally permissible under
the public policy set forth by the Legislature in the Act.

monwealth's authority in this case. Furthermore, since the activity involved is a public nuisance it cannot be regulated, but must be abated. We believe that abatement of water pollution in unquestionably a reasonable exercise of the police power in the abstract." 455 Pa. at 418, 319 A.2d at 885.

We recognize that the Clean Streams Act specifically declares acid mine drainage to be a nuisance[6] and that the Air Pollution Control Act does not specifically state that air pollution, such as would be caused by the operation of Lucerne's beehive coke ovens, is a public nuisance; but, we have no doubt that the Legislature intended the Air Pollution Control Act to eliminate or reduce such air contamination because it is a public nuisance. This Court did not establish the public policy that the owners of property such as Lucerne may not contaminate the air with the emission of tons of particulate matter and pollutants; the people of this Commonwealth made that determination through their duly elected representatives in the Legislature. This Court's duty is to enforce the law.

The record in this case establishes that other beehive coke oven operators are still operating their ovens under variances granted by DER. All of those operations have been continuous and therefore are not subject to the statutory provisions applicable to the coke ovens in this case, which ceased operation for more than the statutory one-year period quoted above. We hold that the one-year provision of section 6.1(a) of the Act, 35 P.S. §4006.1(a), quoted above, is reasonable and does not violate any of Lucerne's constitutional rights.

One final point must be mentioned. Lucerne argues that section 2(iv) of the Act, 35 P.S. §4002(iv),[7] re-

---

6. *See* Act of June 22, 1937, P.L. 87, §§1 and 307, *as amended*, 35 P.S. §§691.1 and 691.307.

7. Section 2 (iv) of the Act reads as follows:

quired DER to consider the economic impact of its decision when dealing with Lucerne's application. The Board concluded that while the Environmental Quality Board is required to consider the economic impact of its regulations in establishing same, DER need not consider economic factors in administering or enforcing those regulations. Furthermore, the Board concluded that the record in this case had not established that the Environmental Quality Board had not taken the economic impact of its regulations into account and reasoned that "[c]lean air may be as important to the economy as 700-750 tons per day of coke." We agree with the Board's conclusion that in the instant case DER was not required to consider economic impact. In cases such as *Bortz, supra,* where DER and the Board have discretion, e.g., in establishing the timetables for enforcement of the regulations, economic impact is a proper issue upon which testimony and evidence should be received, if offered. In a case such as this, where an application for a permit, on its face, fails to comply with the provisions of the Act and the applicable regulations, economic impact need not be considered.[8]

We fully recognize the energy crisis presently confronting our nation. We are in full sympathy with Lu-

---

"It is hereby declared to be the policy of the Commonwealth of Pennsylvania to protect the air resources of the Commonwealth to the degree necessary for the . . .

"(iv) development, attraction and expansion of industry, commerce and agriculture."

8. We believe that it is important to qualify our holding in this case concerning DER's duty to consider economic impact. We believe that in situations, such as the instant case, where the language of the Act is mandatory, DER must enforce the mandatory provision regardless of the economic consequences. If, however, the Act gives DER discretionary authority to act, i.e., setting up timetables, levying fines, granting waivers, etc., we believe DER must consider the economic impact of its actions.

cerne's contention that the supplying of coke to J&L will aid in the economic recovery of our nation and benefit the Pittsburgh area. The problem, however, is that any decision which will establish a balance between the benefits and detriments involved in air pollution control will have to be made where those public policy decisions properly rest, i.e., with the legislative bodies. The federal or state legislative bodies may deem it necessary to issue a moratorium on air pollution control in order to improve the economy but in the absence of any such action, the courts must enforce the law as it exists. In this case we have no choice but to enforce the Air Pollution Control Act, which in effect, prohibits the reactivation of Lucerne's beehive coke ovens.

In summary then, we hold that all of the findings of the Board are supported by substantial evidence. The Board committed no error of law in concluding that the application of Lucerne for the operation of its beehive coke ovens was properly disapproved by DER, because the application did not follow the statutory requirements. The Board properly concluded that none of Lucerne's constitutional rights were violated despite the fact that the record clearly establishes that there is no known method to operate beehive coke ovens in compliance with the applicable regulations. Lucerne's constitutional rights have not been violated because the Air Pollution Control Act and the applicable regulations, as applied to Lucerne, are a reasonable exercise of the Commonwealth's police power. Lucerne has no right, constitutional or otherwise, to emit harmful pollutants into the air in violation of the Act. The adverse economic impact which may result from the refusal of DER to approve Lucerne's application would not permit DER or the Board to disregard the provisions of the Act and the applicable regulations by approving Lucerne's application.

We therefore

151

ORDER

AND NOW, this 19th day of March, 1975, the order of the Environmental Hearing Board, dated March 25, 1974, filed in the above-captioned matter is hereby affirmed.