416 A.2d 995

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Appellant,**

v.

**PENNSYLVANIA POWER COMPANY, Appellee.**

Supreme Court of Pennsylvania.

Argued March 10, 1980.

Decided July 3, 1980.

Ward T. Kelsey, Elissa A. Parker, Asst. Attys. Gen., Pittsburgh, for appellant.

William R. Balph, Jr., Chambers, O'Neill, Nicolls, Balph & Paul, New Castle, John Cramer, Reed Smith Shaw & McClay, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION

NIX, Justice.

### I. *Procedural History*

The Pennsylvania Power Company (PPC), appellee herein, generates and distributes electricity in the western portion of this Commonwealth. The PPC was originally ordered by the Pennsylvania Department of Health, predecessor in interest to the Department of Environmental Resources (DER),[1] to limit its emission of particulate matter from its electrical generating station in Lawrence County, Pennsylvania, in order to comply with the particulate collection efficiency established by Regulation V.[2] The pollutants were emitted from the five coal powered boilers which supplied the power for the generators. That Order was affirmed on appeal by the Pennsylvania Air Pollution Commission on January 11, 1971.[3]

The PPC, however, failed to comply and the DER, on January 12, 1972, filed a complaint in equity in the Common Pleas Court of Lawrence County, seeking judicial enforcement of the January 1971 Order. On January 27, 1972, more

[1]. The DER became the successor in interest to the Department of Health when it was empowered with the responsibility for enforcement of air pollution control laws in the Commonwealth. Air Pollution Control Act (APCA), Act of January 8, 1960, P.L. (1959) 2119, § 4, *as amended*, 35 P.S. § 4004.

[2]. "The limits, specified in § 1.4 of Regulation V of the Air Pollution Commission, were adopted on January 29, 1969, and required approximately 99% particulate matter collection in contrast to the 98% collection efficiency formerly required under Regulation IV." *Commonwealth, Department of Environmental Resources v. Pa. Power Co.*, 461 Pa. 675, 683 n. 2, 337 A.2d 823, 827 n. 2 (1975).

[3]. That body was replaced by the Environmental Quality Board (EQB), 35 P.S. § 4005.

stringent particulate matter regulations and new controls were placed on sulfur dioxide ($SO_2$) emissions.[4] Cognizant of these changes, the Lawrence County Court ordered the PPC to file a new plan for compliance with the new standards.[5] No appeal from this order was taken and the PPC submitted a new plan calling for the installation of additional equipment which would raise the particulate matter collection efficiency to a higher level. In an effort to satisfy the $SO_2$ emission requirements, since the then existing technology was unable to achieve compliance, PPC offered to construct taller stacks to disperse the pollutant higher into the atmosphere and thereby lessen the ground level concentrations. The DER, without passing upon this PPC proposal, petitioned the Lawrence County Court for an adjudication of contempt, contending that the PPC failed to submit a plan that would assure compliance with the standards. Shortly thereafter, a "Complaint for Civil Penalties" was initiated before the Environmental Hearing Board (EHB) against the PPC, 35 P.S. § 4009.1, alleging violations of the DER pollution control regulations at the Lawrence County plant. 25 Pa.Code §§ 123.11 and 123.22. The proceedings before the EHB were deferred pending the disposition of the contempt action.

After a full hearing, the lower court found that the PPC was not in contempt of the September 1972 Order in that it was "technically impossible" to limit its $SO_2$ emissions. This finding was upheld on appeal to the Commonwealth Court, 12 Pa.Cmwlth. 212, 316 A.2d 96 (1974) and affirmed by this Court, 461 Pa. 675, 337 A.2d 823 (1975).

The DER then pursued the civil penalty petition pending before the EHB. After a full evidentiary hearing, the EHB assessed civil penalties against the PPC for violations of the

4. These regulations were made part of the Pa.Code after the federal Environmental Protection Agency Administrator approved them on May 31, 1972.

5. The Order was amended on September 1, 1972, directing the PPC to burn low ash coal until the new standards were met.

regulations.[6]  Adjudication Docket No. 72–428–CP–C April 16, 1976.  On appeal, the Commonwealth Court affirmed the penalties assessed for the particulate matter emission violation but reversed those imposed for the sulfur dioxide emissions.  34 Pa.Cmwlth. 546, 384 A.2d 273 (1978).  The Commonwealth Court reasoned, "(I)t cannot rationally be contended that the effect obtained by Section 9.1 penalties (35 P.S. § 4009.1) substantially furthers the professed purpose behind the legislation.  Any intended regulatory aspect of the civil penalties assessed under Regulation 123.22 fails to further any public interest."  That court thus concluded, "the imposition of civil penalties for violation of Regulation 123.22 are in violation of PPC's constitutionally protected property rights."  *Id.*, 34 Pa. Cmwlth. at 573, 384 A.2d at 286.

On June 26, 1978, this Court granted the DER's petition for allowance of appeal to review the Commonwealth Court's holding of a constitutional prohibition against the imposition of civil penalties for the failure to comply with standards that are "technologically impossible" to meet.  42 Pa.C.S.A. § 724(a).

## II.  *Merits*

The question to be addressed is whether Section 9.1 of APCA, 35 P.S. § 4009.1, is unconstitutional to the extent that it authorizes the EHB, pursuant to a DER request, to assess civil penalties for the violation of an air pollution regulation with which present technology renders compliance impossible.  Prior to arriving at an answer as to the constitutionality of the civil penalty provision, it is necessary to determine whether the statute confers the authority upon the DER to set air quality standards which are "technologi-

---

**6.** For 217 violations of 25 Pa.Code § 123.11 (particulate matter) $21,700 was assessed, but no punitive damages were found because the filing of the new proposal by the PPC refuted any claim of willful conduct.  For 1,737 violations of 25 Pa.Code § 123.22 (SO$_2$ emissions) $173,700 was charged and again no punitive damages were awarded because the EHB held itself collaterally estopped from finding willful conduct due to the Common Pleas Court's determination that compliance was "technologically impossible."

cally impossible" at the time of the promulgation of the standard.

A—*The authority to set technically impossible standards*

In order to answer this initial question, an understanding of the present environmental regulatory scheme in the area of air pollution control is critical. Responding to the demand for air pollution control to reverse the deteriorating air quality throughout the nation, Congress passed the Clean Air Amendments of 1970, 42 U.S.C.A. § 1857 *et seq.* (CAA). Major modification of this legislation took place through the amendments enacted in 1977. 42 U.S.C.A. §§ 7401–7626 (Supp.1980).

In an effort to attain the desired national air quality level, the Act created a federal-state cooperative process of environmental regulation and enforcement. Under the CAA scheme, the Environmental Protection Agency Administrator was given the power to promulgate "ambient air quality standards" for each region of the nation.[7] Each state within its respective region would then devise and offer for the Administrator's approval a plan known as the State Implementation Plan or SIP "which provides for implementation, maintenance, and enforcement" of the ambient air quality standards within the boundaries of that state. 42 U.S.C.A. § 1857c–5(a)(1). After approval of the SIP, the state becomes the primary regulatory and enforcement organ. Only when the state fails to fulfill its statutory obligation will the federal government (EPA) assert its enforcement authority.[8]

Under this State's own Air Pollution Control Act (APCA), 35 P.S. § 4001 *et seq.*, the Environmental Quality Board (EQB) was given the authority to "adopt rules and regulations, for the prevention, control, reduction and abatement

7. 42 U.S.C.A. § 1857c. They were published on April 30, 1971, 34 Fed.Reg. 8186.

8. The constitutionality of this scheme against a claim that it encroaches upon state sovereignty was upheld in *Commonwealth v. EPA*, 500 F.2d 246 (3d Cir. 1974). The United States Supreme Court has yet to pass upon this issue. This question is not before us and our opinion today is not to be construed as reflecting in any manner on the legitimacy of that contention.

of air pollution, applicable throughout the Commonwealth . . ." 35 P.S. § 4005. Pursuant to both APCA and CAA, the EQB, on January 27, 1972, adopted a SIP for Pennsylvania which was approved by the EPA Administrator on May 31, 1972. The SIP has been set forth at 25 Pa.Code §§ 121–141.

The scheme created by the CAA of federal-state regulatory partnership makes the federal point of view as to the permissibility of setting "technologically impossible standards," extremely important to our discussion.

The Congressional intention was capsulized by the then Senator Edmund Muskie who was one of the prime sponsors of the bill in the Senate,

> The first responsibility of Congress is not the making of technological or economic judgments—or even to be limited by what is or appears to be technologically or economically feasible. *Our responsibility is to establish what the public interest requires to protect the health of persons. This may mean that people and industries will be asked to do what seems to be impossible at the present time.* (Emphasis added). 116 Cong.Rec. 32901–32902 (1970).

The Senate committee report embraced this view.

> In the Committee discussions, considerable concern was expressed regarding the use of the concept of technical feasibility as the basis of ambient air standards. The Committee determined that 1) the health of people is more important than the question of whether the early achievement of ambient air quality standards protective of health is technically feasible; and 2) the growth of pollution load in many areas, even with application of available technology, would still be deleterious to public health.

> Therefore, the Committee determined that existing sources of pollutants either should meet the standard of the law or be closed down . . . . S.Rep.No.91–1196, pp. 2–3 (1970).[9]

**9.** It is important to note that the 1977 Amendments recognized a middle ground between compliance and closure, the one adopted by

Indifference to the "state of the art" was condoned by the United States Supreme Court in *Union Electric Co. v. EPA*, 427 U.S. 246, 256–57, 269, 96 S.Ct. 2518, 2525–2526, 2531, 49 L.Ed.2d 474 (1976), when the EPA Administrator's approval of the Missouri SIP was upheld in the face of a utility's challenge on the basis of technological impossibility.

. . . The Administrator's position is that he has no power whatsoever to reject a state implementation plan on the ground that it is economically or technologically infeasible, and we have previously accorded great deference to the Administrator's construction of the Clean Air Act. See *Train v. NRDC*, 421 U.S. 60, at 75, 95 S.Ct. 1470, 43 L.Ed.2d 731. After surveying the relevant provisions of the Clean Air Amendments of 1970 and their legislative history, *we agree that Congress intended claims of economic and technological infeasibility to be wholly foreign to the Administrator's consideration of a state implementation plan.*

As we have previously recognized, the 1970 Amendments to the Clean Air Act were a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution. *The Amendments place the primary responsibility for formulating pollution control strategies on the States to strict minimum compliance requirements. These requirements are of a "technology-forcing character,"* Train v. NRDC, supra, at 91, 95 S.Ct. 1470, 1487, *and are expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible.*

\*        \*        \*        \*        \*        \*

Technology forcing is a concept somewhat new to our national experience and it necessarily entails certain risks. But Congress considered those risks in passing the 1970 Amendments and decided that the dangers posed by uncontrolled air pollution made them worth taking. Peti-

EHB here, of assessing a penalty for noncompliance with the appropriate emission standard. 42 U.S.C.A. § 7420 (Supp.1980).

tioner's theory would render that considered legislative judgment a nullity, and that is a result we refuse to reach. (Emphasis added).

At the foundation of this theory of "technology forcing" is the premise that the desired air quality will best be achieved by enunciating a "governmental tolerance level" of pollutants and then placing the pressure of compliance upon the polluter. This concept also recognizes the ingenuity and innovativeness of American industry. If the present "state of the art" is such that it does not permit compliance, economic incentive (i. e., a desire to stay in operation or avoid fines), provides the stimulus to produce "private emission-control innovation." [10] The responsibility is shifted to the private sector to develop the means to reduce air pollution. The polluter will not be permitted to continue polluting simply because there are no present means available to control that pollution in the industry. To the contrary, continued profitable conduct of the activity will depend upon the industry's ability to develop the necessary controls.

While *Union Electric* approved technology forcing, it did not preclude the consideration of the "state of the art" in all situations.

Our conclusion is bolstered by recognition that *the Amendments do allow claims of technological and economic infeasibility to be raised in situations where consideration of such claims will not substantially interfere with the primary congressional purpose of prompt attainment of the national air quality standards. Thus, we do not hold that claims of infeasibility are never of relevance in the formulation of an implementation plan or that sources unable to comply with emission limitations must inevitably be shut down.*

*Perhaps the most important forum for consideration of claims of economic and technological infeasibility is before*

10. Comment, *Forcing Technology: the Clean Air Act Experience,* 88 Yale L.J. 1713, 1718 (1979); *see also,* Comment, *Technology Forcing Under The Clean Air Act: The Electric Utility Dilemma,* 38 U. of Pitt.L.R. 505 (1977).

*the state agency formulating the implementation plan.
So long as the national standards are met, the State may
select whatever mix of control devices it desires, Train v.
NRDC, supra,* at 79, 95 S.Ct. 1470, and industries with
particular economic or technological problems may seek
special treatment in the plan itself.    .    .    .

Moreover, if the industry is not exempted from, or accommodated by, the original plan, it may obtain a variance, as
petitioner did in this case; and the variance, if granted
after notice and a hearing, may be submitted to the EPA
as a revision of the plan.

.         .         .         .         .

Lastly, an industry denied an exemption from the implementation plan, or denied a subsequent variance, may be
able to take its claims of economic or technological infeasibility to the state courts. (Emphasis added). *Union Electric Company v. EPA,* at 266–267, 96 S.Ct. at 2529.

In the instances specified, whether technological impossibility will be recognized as a defense or the SIP air quality
standards steadfastly adhered to, appears to be a matter
Congress left solely to the State's discretion so long as the
regional ambient air quality standards are met. Turning to
Pennsylvania's enactments to determine this Commonwealth's position, we find the original purpose clause of the
APCA specifically called for an investigation into the technical feasibility of the regulations adopted. *See* 35 P.S. § 4002
*Historical Note.* In 1968, however, this clause was amended,
and all language requiring such an investigation was discarded. Act of June 12, 1968, P.L. 163, No. 92, § 1; 35 P.S.
§ 4002.

§ 4002.  Declaration of policy

It is hereby declared to be the policy of the Commonwealth of Pennsylvania to protect the air resources of the
Commonwealth to the degree necessary for the (i) protection of public health, safety and well-being of its citizens;
(ii) prevention of injury to plant and animal life and to
property; (iii) protection of the comfort and convenience
of the public and the protection of the recreational re-

sources of the Commonwealth; and (iv) development, attraction and expansion of industry, commerce and agriculture.

The exclusion of the concern for "technologically feasible" regulations, permits the conclusion that the legislature approved "technology forcing."

Prior decisions in this jurisdiction evidence a very limited acceptance of the impossibility defense. In this Court's previous encounter with this case, the claim of technological impossibility was recognized as a defense. 461 Pa. 675, 337 A.2d 823 (1975). That holding, however, is properly limited to contempt proceedings. As previously noted, impossibility was asserted by the PPC in defense of the DER claim that it had failed to comply with the Common Pleas Court's Order of September 1972, directing the filing of a new plan designed to comply with the then newly promulgated regulations. In a contempt proceeding the focus is upon the alleged contemnor's "willful disregard or disobedience of the court's orders." Thus in that instance, it becomes incumbent upon the examining court to inquire into the accused's ability to perform the act or function instructed.

It is hornbook law that contempt is any conduct that "brings into disrespect the authority of a court, . . . willful disregard or disobedience of the court's orders, . . . conduct which tends to impede the due administration of justice" and that such contemptuous conduct must be predicated on "some degree of delinquency or misbehavior . . . ." 7 P.L.E. Contempt § 1 at 517. Accordingly, it follows that the power of the court to punish contempt may be exercised to vindicate the dignity of the court for disrespect shown to it or its orders or to compel the performance of some order or decree of the court which is in the power of the party to perform and which he refuses to obey. 3 Am. & Eng.Ency. of Law 794.

With the preceding in mind, it is clear that a showing of noncompliance with a court order in itself is not sufficient to prove contempt. If it is demonstrated that an alleged contemnor is unable to perform (in contrast to willfully

disobeying) and has in good faith attempted to comply with a court order (in contrast to having shown disrespect), the purposes for punishing noncompliance are eliminated. (Citations omitted.) *Id.*, 461 Pa. 675 at 687, 337 A.2d 823 at 829.

The fact that technological impossibility provides insulation to a polluter in an action for contempt, does prevent the Commonwealth from devising means to force technological advancements to eliminate the pollution, if the activity is to be permitted to continue. The imposition of the civil penalties, with which we are here concerned, was not imposed as punishment for a willful disregard of an agency or court order, but rather as an incentive to urge the development of procedures that will eventually eliminate the pollutant.

This position is confirmed by the rulings in *Bortz Coal Co. v. Commonwealth*, 2 Pa.Cmwlth. 441, 279 A.2d 388 (1971) (*Bortz I*), *appeal after remand*, 7 Pa.Cmwlth. 362, 299 A.2d 670 (1973) (*Bortz II*), and *Rochez Brothers Inc. v. DER*, 18 Pa.Cmwlth.Ct. 137, 334 A.2d 790 (1975). In *Bortz I*, the court indicated that the coke producing company's claim that there was no practical method for compliance with the Department of Health's particulate matter emission standards and that, therefore, the industry would be forced out of business, was inconsequential if the evidence proved a violation. The matter was then returned to the agency for the production of evidence as to the violation and consideration of the economic impact.[11] On appeal after the remand, (*Bortz II*), the court affirmed the Order of the Board requiring the company to operate its coke ovens in accordance with the air quality standards or close down.

In *Rochez*, the Commonwealth Court upheld the DER's authority to deny an application to reactivate a coke producing operation in the face of assertions that no technology was available which permitted conformity with the emission standards and that the ailing steel industry begged for the additional coke supply. In so doing, the court distinguished

11. 35 P.S. § 4002(iv) was seen to require such a determination of economic impact.

the propriety of the impossibility defense in a contempt action as opposed to the regulatory enforcement action.

Lucerne points to the opinion of this Court in *Commonwealth of Pennsylvania, Department of Environmental Resources v. Pennsylvania Power Company,* 12 Pa. [Cmwlth.] 212, 316 A.2d 96 (1974) as support for its contention that if it is impossible to comply with the regulations then the regulations cannot be enforced. This reasoning is fallacious for the reason that the *Pennsylvania Power* case dealt with contempt proceedings arising out of an equity action, and the validity of DER's regulation was not specifically at issue. In *Pennsylvania Power* we decided that under the law, the defense of impossibility of performance was available to a defendant in a contempt proceeding, where his inability was not of his own making. This case and *Pennsylvania Power, supra,* are not alike, either substantively or procedurally. *Id.,* 18 Pa.Cmwlth. Ct. at 146, 334 A.2d at 795–796

Thus Pennsylvania has recognized that technological impossibility will not provide a license to continue in an industrial activity which falls below the designated air quality standards. This judgment is consummate with the clearly expressed congressional intent, and its constitutional propriety has been recognized by the U.S. Supreme Court. *Union Electric Co. v. EPA, supra.*

B—*Is the imposition of civil penalties for noncompliance with the technologically impossible standards constitutional*

Proceeding from the premise that the state may force the termination of an industrial activity for noncompliance with technologically impossible standards, we now consider the judgment of the Commonwealth Court that the imposition of civil penalties for such conduct is unconstitutional. We begin this analysis with the recognition that "technological forcing" would be severely restricted if the regulating body is to be limited to the options of compliance or closure. It is evident in cases of technological impossibility that immediate compliance could not be achieved and closure does not

provide the incentive for the developmental process necessary to meet the problem. Thus the concept of "technological forcing" by its terms recognizes that an unacceptable air quality level will be condoned for a period of time during which the developmental process is occurring. Industrial prosperity, from which tax revenues are derived, and the health of the citizenry, are both matters of high priority for any governmental unit. Where these two interests conflict some accommodation must be made. Congress has given priority in the area of air quality to the health of the citizenry, but it has also provided the flexibility to allow for the other important concern for industry. Thus the question properly framed is whether during the period where an unacceptable pollutant level is being permitted a regulatory body may constitutionally impose, as a condition, a fine to act as an incentive to the industry to develop processes to meet the pollution problem.

The Commonwealth Court's conclusion that the imposition of civil penalties in this case was based upon a misperception as to the meaning of "technological impossibility." It erroneously gave to that term an absolute quality. The entire theory "technology forcing" is the expectation that with experimentation a procedure can be found to place the emissions within acceptable limits. Accepting this predicate, and recognizing that if experience proves in a given instance that this thesis is erroneous, the dynamics of business would terminate the enterprise, we cannot agree with the Commonwealth's thesis that the assessment of civil penalties in this case was not reasonably related to the achievement of the public interest and thus an abuse of the state's police power.

Property rights are not absolute and a state, in order to protect the health, safety and welfare of its citizens may, under its police power, impinge on that interest by regulation. *Commonwealth v. Barnes & Tucker Co.*, 472 Pa. 115, 371 A.2d 461 (1977); *DePaul v. Kauffman*, 441 Pa. 386, 272 A.2d 500 (1971); *Nolan v. Jones*, 263 Pa. 124, 106 A. 235 (1919). In *Commonwealth v. Barnes & Tucker*, 472 Pa. at

123, 371 A.2d at 465, we reiterated the test adopted in this jurisdiction for determining whether the state has properly exercised its police powers.

> To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. *The legislature may not*, under the guise of protecting the public interests, *arbitrarily interfere with private business or impose unusual* and *unnecessary restrictions upon lawful occupations.*"

*See also Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 93, 306 A.2d 308, 317 (1973). The test consistently adhered to by the United States Supreme Court for analyzing an economic regulation of business against a constitutional claim was set forth in *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934).

> If the laws passed are seen to have a reasonable relation to a proper, legislative purpose and are neither arbitrary nor discriminatory, the requirements of due process are satisfied . . . .

Regardless of the tests applied, the same analysis is required. It must be found that the state action seeks to achieve a legitimate state interest and that the means adopted is reasonably related to the attainment of that end.

"It must be recognized that one who challenges the constitutionality of the exercise of the state's police power, affecting a property interest, must overcome a heavy burden of proof to sustain that challenge." (Citations omitted.) *Commonwealth v. Barnes & Tucker Co.*, 472 Pa. at 123, 371 A.2d at 465. "Because regulations implementing the Air Pollution Control Act are promulgated pursuant to a grant of legislative power they enjoy a presumption of reasonableness." *Com., Department of Environmental Resources v. Locust*, 483 Pa. 350, 360, 396 A.2d 1205, 1210 (1979); *see also* 1 Pa.C.S.A. § 1922.

■ This Court previously recognized that inherent in the protection of its citizenry's health, is the legislature's interest in keeping the air free from pollutants. "[P]rotection of air resources is a matter of highest priority in the Commonwealth." *Commonwealth, Department of Environmental Resources v. Locust*, 483 Pa. at 358, 396 A.2d at 1209. Certainly the establishment of sulfur dioxide emission levels, by seeking to reduce air pollution, serves the legitimate state interest of maintaining the health of the citizenry of this Commonwealth.

■ As we have stated, in order to achieve that end, the state could have ordered closure of any facility that fails to comply with the promulgated emissions standards.[12] By adopting a lesser sanction, imposition of civil penalties, the state allows the facility, PPC, to continue in business, giving it an opportunity to devise new technologies to reduce the sulfur dioxide emissions, spurred on by the desire to avoid the continued payment of fines. In this way, the assessment of civil penalties is not only an amicable accommodation, striking a proper balance between the extremes of permitting unbridled pollution and a complete shutdown of the polluter industry, but it provides the spark to ignite the engine for technological change in the industry. Further, the monies collected are not merely utilized to operate the DER, but rather are funneled directly into the Commonwealth Clean Air Fund which is specifically earmarked for the "elimination of air pollution." 35 P.S. § 4009.2, *see* 25 Pa.Code § 143.1. "Technology forcing," by the imposition of civil penalties, in this instance, is reasonably related to the reduction of pollution in this state and, therefore, cannot be said to violate the constitutional protection of the PPC's property interests. *Cf. United States v. Marathon*, 589 F.2d 1305 (7th Cir. 1978); *United States v. Arco*, 429 F.Supp. 830 (E.D.Pa.1977), *affirmed Gulf Oil Corp. v. United States*, 573 F.2d 1303 (3d Cir. 1978).

12. *See Union Electric Co. v. EPA, supra.* The Commonwealth Court took no issue with the constitutionality of closure. 34 Pa.Cmwlth. at 572 n.18, 384 A.2d at 286 n.18.

In reaching its decision on the sulfur dioxide emissions, the Commonwealth Court considered only the assertion of constitutional impropriety. That court expressly deferred consideration of appellee's other claims of claim preclusion, collateral estoppel, election of remedies and variance as to the sulfur dioxide emissions.[13] Although appellee raises these arguments as alternative positions, sound jurisprudence dictates that the Commonwealth Court should first be permitted to pass upon them.

Accordingly, that portion of the Commonwealth Court's Order declaring the imposition of civil penalties unconstitutional is reversed, and the cause is remanded to the Commonwealth Court for consideration of PPC's remaining claims.

---

**13.** Similar claims were disposed of by the Commonwealth Court in that portion of the opinion affirming the imposition of civil penalties for particulate matter violations. No appeal from that part of the Order was taken.